UNITED STATES of America,
Appellee,

v.

Liborio BELLOMO, also known as Barney, James Ida, also known as Jimmy, also known as Little Jimmy, also known as the Little Guy, and Nicholas Frustaci, also known as Nicky the Blond, Defendants–Appellants,

Thomas Cestaro, also known as Gigali, also known as Gigalese, Thomas Barrett, John Schenone, also known as Big John, Anthony Pisapia, also known as Tony Waterguns, also known as Fat Tony, Louis Zacchia, also known as Louis Zack, Anthony Coiro, Michael Autuori, Leonard Cerami, Louis Ruggiero, Sr., Colombo Saggese, also known as Edward, Joseph Pisacano, James Pisacano, Albert Setford, also known as Spike, Vincent Batista, also known as Skippy, Vincent Romano, and Michael Generoso, also known as Mickey Dimino, Defendants.

Docket Nos. 97–1332, 97–1542, 97–1563, 97–1588 and 97–1599.

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1998.

Decided April 30, 1999.

John Pollok and Susan Wolfe, Hoffman, Pollok & Pickholz, LLP, New York, NY (David M. Greenberg, of counsel), for Appellant James Ida.

Alan S. Futerfas, New York, NY (Ellen B. Resnick, of counsel), for Appellant Nicholas Frustaci.

Nelson A. Boxer, Assistant United States Attorney for the Southern District of New York, (Mary Jo White, United States Attorney, Maria A. Barton, Barbara A. Ward, Dietrich L. Snell, Craig A. Stewart, Assistant United States Attorneys, of counsel), for Appellee.

Before: VAN GRAAFEILAND, CABRANES and NOONAN,* Circuit Judges.

NOONAN, Circuit Judge:

James Ida and Nicholas Frustaci appeal their convictions, entered following a jury trial in the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge*), of violations of RICO, 18 U.S.C. § 1962(c) and (d) and of various additional charges of murder, conspiracy to murder, illegal gambling, conspiracy to control a union election by violence, extortion, interstate transportation of stolen property, mail fraud, and fraud upon the Internal Revenue Service. Ida appeals the forfeiture of his property. We affirm the forfeiture of Ida's property and we affirm his conviction in part; and we affirm Frustaci's conviction.

## PRELIMINARY OBSERVATIONS

The indictment charged "the Genovese Family of La Cosa Nostra" as an enterprise as defined by RICO, 18 U.S.C. § 1961(4) and added that the Genovese Family "was part of a nationwide criminal organization known by various names, including 'the Mafia' and 'La Cosa Nostra', which operated through entities known as 'Families'." These allegations in the indictment were proven at trial by the government's witnesses. These characterizations are not challenged on appeal.

A large part of the government's case depended on testimony on "the rules" gov-

---

* The Honorable John T. Noonan, Jr., United States Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

erning the organization of the Families of La Cosa Nostra. The testimony was that the Families were organized in a hierarchy regularly consisting of the boss, the underboss and the consigliere. Lesser authority was assigned to capos who had a small number of persons reporting to them. The rules required that those working for the capos disclose their criminal activities and share their proceeds with the capos, who in turn would report and share with the higher officers. Members of a Family were initiated into the Family in a formal induction and were thereafter considered "made." Associates worked with made members under the Family's direction. Hangers-on helped the organization but were neither members nor associates. The hierarchy and control structure in La Cosa Nostra have similarly been demonstrated in other cases. *E.g., United States v. Gigante,* 166 F.3d 75 (2d Cir.1999); *United States v. Locascio,* 6 F.3d 924, 936–37 (2d Cir.1993); *United States v. Pungitore,* 910 F.2d 1084, 1098 (3d Cir.1990).

■ The structure of the crime families was outlined by government experts and also by Alphonse D'Arco, who had been the acting boss of the Lucchese Family, and Carmine Sessa, who had been the acting boss of the Colombo Family. Parts of D'Arco's and Sessa's testimony bear on the structure and rules of the Families of La Cosa Nostra. It was within the province of the jury to decide if this testimony was probative as to the structure and rules of the Genovese Family.

The defendants point out that the rules in a number of respects were not observed. The rule against drug dealing was not observed, for example, by D'Arco. The rule against a member introducing himself or stating his rank in the organization was not always kept as the testimony of D'Arco also indicates. There was a further discrepancy between D'Arco's testimony that a member running a gambling operation did not have to share the proceeds with his capo and the testimony of a government expert that he did. The jury had to decide who to believe on that question. The jury had to decide how regularly the rules were kept. The jury had sufficient information to determine whether a rule could be treated as an indicator of actual conduct or whether a rule was infrequently or never observed.

■ The defendants appeal many of the evidentiary rulings of the district court on the ground that hearsay was improperly admitted. Under the rule set out by *Gigante,* 166 F.3d at 82, in order to comply with Fed.R.Evid. 801(d)(2)(E) and admit the testimony of a coconspirator, the district court "in each instance must find the existence of a specific criminal conspiracy beyond the general existence of the Mafia." It is objected that evidence was admitted simply on the theory that the coconspirators' statements were in furtherance of the general conspiracy of La Cosa Nostra.

■ This court directed the appellants to provide briefing with specific instances of where the hearsay of coconspirators was improperly admitted on this basis. It is now apparent that a number of the instances objected to were not instances of hearsay, that is, statements made by an out-of-court declarant offered by a witness for the truth of the matter stated. *See* Fed.R.Evid. 801(c); *United States v. Detrich,* 865 F.2d 17, 20 (2d Cir.1988); 6 *Wigmore on Evidence* § 1776 (Chadbourn rev. 1976 & 1998 Supp.). The most significant statements fall into the category of commands as to which the witness was the percipient hearer of the command. Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay. *United States v. Stratton,* 779 F.2d 820, 830 (2d Cir.1985).

■ In this fashion the defendants object to what was non-hearsay when they object that near the start of his testimony, Carmine Sessa was permitted to testify to what Carmine Persico, the boss of the

Colombo Family, told him about his duty to carry out orders, including murder, and his obligation of overriding loyalty to the Colombo Family. Similarly Ida objects to D'Arco's account of his conversation with Victor Amuso when D'Arco was told that he was being made the acting boss. D'Arco testified that Amuso gave this order to him: "None of this and none of this without my okay," accompanying these two expressions with two gestures, one a pinch of his fingers and the other pointing a finger like a gun. There was no hearsay. D'Arco's testimony was to the communication of words he heard and gestures he saw. The meaning of the gestures, as understood by D'Arco, was "no making of members" and "no killing of people" without the boss's okay.

■ In another instance where Ida alleges hearsay, Sessa was asked, "What was your understanding of why Dominick Somma was being killed?" to which Sessa answered, "I was told that he was dealing in drugs." The answer bore on Sessa's state of mind not on the truth of the motive for murder. Frustaci objects that D'Arco bolstered his credibility by testimony showing his inside knowledge of the crime families particularly by testifying to statements made to him. Such testimony similarly went to D'Arco's state of mind not to the truth of any fact in any declaration to which he testified. Again, Sessa testified that he had "criminal conversations while everybody was around the table." He was able to testify without hearsay as to what he himself had done, viz., engage in such conversation. He also testified that he usually met with his crew on weekdays and in restaurants. This testimony, now italicized in briefing as objectionable hearsay, is but a simple report of Sessa's own conduct.

■ Sessa also testified that he carried out an order to kill an informer by shooting at him six times as the informer backed into his own garage. Within two hours he reported the shooting to the acting boss of the Colombo Family at the latter's home; that report consisted in a single sentence: "Everything's okay with that thing." The report was made from a pay phone "so there would be no record." Ida objected only to Sessa's testifying to his single-sentence report. The testimony was properly admitted. Sessa was testifying to what he himself had said.

■ Again, D'Arco testified to a narcotics transaction in which he received a kilo from Davie Petillo, an associate of Lucky Luciano. D'Arco was testifying to his own crime. Another "hearsay" objection is made to D'Arco's testimony that he saw Dilorenzo playing cards with a known federal informer and that "Carlo later on observed the same thing himself and came back and told me it's true." The testimony related specifically to the murder conspiracy with which Ida was charged, and which was proven by independent evidence to include Ida.

■ Finally, there is a general objection by both appellants to testimony about a number of murders and other acts of violence by the Colombo and Lucchese Families with the effect of leading the jury to think that members of the Genovese Family would behave in the same way of life. The objection is essentially an objection to relevance, not an objection to hearsay. As to relevance, it was—within broad limits not transgressed here—in the trial court's discretion to decide whether the structures of the other two crime Families were similar enough to the Genovese Family for the jury to be permitted to draw inferences from conduct of the other two Families. Moreover, defense counsel in their opening statements had assaulted the credibility of D'Arco and Sessa as the testimony of murderers. The government was permitted to impeach its own witnesses to anticipate devastating cross-examination if such crimes were left unmentioned. It was not the government but counsel for a defendant who asked Sessa, "As you sit here now, do you consider

588

yourself a vicious person for participating in the 13 murders you did?"

■ We have considered separately and cumulatively all the instances in which the appellants allege the improper admission of hearsay by conspirators. No hearsay that substantially affected the rights of the defendants was admitted. The statute is therefore conclusive: "On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111; accord, Fed.R.Crim.P. 52(a).

*James Ida*

Ida attacks the sufficiency of the government's evidence on each of the counts of conviction and on every one of the predicate acts of racketeering used to sustain Count 1, violation of 18 U.S.C. § 1962(d) (RICO conspiracy), and Count 2, violation of 18 U.S.C. § 1962(c) (substantive RICO). We review the challenges act by act.

*The Murder and Conspiracy To Murder Anthony Dilorenzo*

■ According to D'Arco, D'Arco and Anthony "Hickey" Dilorenzo had been incarcerated together in Raybrook Prison in 1985. Dilorenzo was a made member of the Genovese Family. He "acted strange" by talking about drug deals and by associating with a prisoner believed by D'Arco to be a government informer. D'Arco discussed the matter with another prisoner, Carlo Mastrototaro, a member of the Springfield, Massachusetts branch of the Genovese Family. Mastrototaro stated: "We will straighten it out in the street." Ida's hearsay objection to D'Arco testifying to Mastrototaro's statement was properly overruled on the ground that the statement was made by one coconspirator to another coconspirator in furtherance of the conspiracy to eliminate the informer.

In late 1988 Dilorenzo and D'Arco were both out of prison. Near the end of 1988 D'Arco encountered him on Prince Street in the company of Peter Chiodo, a capo in the Lucchese Family, and Raffie Cuomo, a member of the Lucchese Family. A week or so later in a restaurant in Manhattan D'Arco met him sitting with another soldier in the Lucchese Family and an associate of the Gambino Family. Dilorenzo started to talk business to D'Arco, who asked him to step outside. Dilorenzo then asked D'Arco to introduce him to Carlo, a Lucchese associate who was a heroin dealer. D'Arco told him that "the last couple of guys" that talked about narcotics, "they whacked them." After this conversation D'Arco warned members of the Lucchese Family to stay away from Dilorenzo, believing that Dilorenzo was wearing a wire. D'Arco also talked to Ida who told him to tell the members of the Lucchese Family not to give Dilorenzo "confidence", i.e. do things together with him.

A little later D'Arco encountered Ida sitting with Dilorenzo at the Tazza di Café. Dilorenzo greeted D'Arco, stating that he knew him: "I go back with this kid, I used to hijack trucks." Ida was livid but sat "just with a little smile on" while Dilorenzo "kept it up for three or four minutes." Raffie Cuomo then entered the restaurant, greeted Dilorenzo as a friend, and left with him. Ida and D'Arco were alone together. Ida motioned to D'Arco to step outside and said to D'Arco, "Why they giving him so much, you know ... keep them away from him, from Hickey." D'Arco said, "I'll see what I can do." He was about to say, "It's your own guy. Why don't you keep him away?" but Ida said, "You know what we are going to do?" D'Arco did not answer him. Ida said, "We are going to whack him."

On November 25, 1988, Dilorenzo was at his home in the town of West New York in New Jersey. In the early evening a jogger saw a man shooting into the front door of Dilorenzo's house. He also saw a car with New York license plates double parked in front of the house with a driver waiting. The jogger ran to call the police. The car was gone when the jogger re-

turned from making his call. The police arrived at about 7:50 p.m. and came upon Dilorenzo shot to death in his backyard patio. The gun used to kill him was found on the other side of the backyard fence.

At 10:02 p.m. a collect call was made from a public telephone in West New York at a location three miles from Dilorenzo's home. The collect call was accepted at Ida's home on Staten Island. At 10:31 p.m. a second call was made from this public telephone to Ida's home. A third such call was made at 10:59 p.m. At midnight, at another public telephone booth less than a mile from the first, a fourth collect call was made to Ida's residence. Each of the four calls lasted one minute or less. No other collect call in the period November 16, 1988–December 16, 1988 was recorded from West New York to Ida's home.

The conclusion that Ida was a participant in a conspiracy to murder Dilorenzo and aided and abetted that murder is a conclusion based on the convergence of these pieces of evidence:

1. Dilorenzo as a made member of the Genovese Family had obligations to the Genovese Family; if the Genovese Family believed he was an informer it is likely the family would seek his death. It is equally unlikely that his death would have been arranged by some other branch of La Cosa Nostra.

2. Ida, only later consigliere but then a capo in the Genovese family, took specific responsibility to warn the Lucchese Family that Dilorenzo could not be trusted.

3. Ida told D'Arco, "We are going to whack him." "Whack" in Mafia argot now commonplace in gangster movies means "kill." The "we" of this sentence must be understood in the context of the conversation as referring to the Genovese Family. A reasonable jury could understand this statement as a declaration by Ida that he had associated himself with this project of the Genovese Family to kill Dilorenzo. A further reasonable inference is that if Ida, only a capo, was privy to the project, he was expected by the administration of the Genovese Family to have a part in its execution.

4. The murder of Dilorenzo was itself an overt act of the conspirators. Its connection with the conspirators is proved by the four telephone calls. The jury did not know the identity of the caller or the identity of the answerer or the content of the calls. The jury could reasonably infer that the answerer at Ida's residence knew the caller or otherwise would not have accepted the first and the three subsequent collect calls. The jury could reasonably infer that the calls were connected to the murder—how else explain, except by improbable coincidence, four such calls from West New York on a single night when no other such calls were recorded at Ida's residence in the relevant period? The jury could reasonably infer that the caller knew that what he had to say about the murder would be of immediate interest to Ida.

Are there other possibilities such as to cause reasonable doubt? Suppose (1) that Dilorenzo had been murdered by someone because of a drug deal and the caller merely wanted to inform Ida of the event. Suppose (2) that the four calls had nothing to do with the murder and related only to some other criminal enterprise going on on the seamy side of this city of 38,000 persons. Suppose (3) that the Lucchese Family, convinced of Dilorenzo's untrustworthiness and tired of Genovese Family procrastination, had taken matters into their own hands and eliminated the suspected informer. None of these possibilities amounts to more than a hypothetical unsupported in the record. As to (1) the jury could reasonably conclude that such persistence in telephoning from public telephones would not have characterized a caller having no connection with the killing. As to (2), the jury could reasonably conclude that if Ida had other criminal business in West New York other traces of it would have appeared in his records. As to (3), the jury could reasonably con-

clude that D'Arco was credible and that he was not carrying out a plot, blaming the Genovese Family for a murder he would have known was carried out by the Lucchese Family.

There is much that must remain a matter of speculation. The New York license plates on the car prove nothing. The jury could not be sure whether the calls came from the murderer, the driver, or some go-between. The jury could not be sure that Ida himself received any of the calls—the repetitions could have occurred because each time Ida was out. The jury could not have been sure whether the caller was calling to report the murder accomplished or to ask for assistance in the absence of the getaway car or to get directions as to what to do now. The capital point is that the caller, with a name known at Ida's home, had to know that the murder was the concern of Ida. The calls connect the killing to the conspirators and, in particular, to the conspirator who had taken responsibility for reining in Dilorenzo. It is undisputed that the conspiracy to murder Dilorenzo was in furtherance of the racketeering enterprise constituted by the Genovese Family.

*The Conspiracy To Murder Dominic Tucci*

■ John Schenone was an associate of the Genovese Family and a member of Ida's crew. In December 1994 he was married to Carol Schenone and living sometimes with her and sometimes with a girlfriend, Eve Marie Ahearn. Dominic Tucci, also married, began an affair with Eve Marie Ahearn. When Schenone heard about it he called Tucci and threatened to kill him.

Schenone used Richard Sprague, a bartender, as an assistant in various criminal undertakings and as a driver. Sprague later became a witness for the government. In December 1994 Schenone told Sprague that he could not murder Tucci without getting Ida's permission. Schenone told Sprague that Ida refused permission.

Meanwhile, Tucci, upset by the threat, had moved from his own home to his mother's house. His mother's cousin was Michael Bove, a soldier in the Genovese Family. Tucci told Bove about the threat, and Bove told him not to worry about it.

Schenone continued to be upset by Tucci's affair. According to Sprague, as he drove Schenone back from Ida's residence in Katonah, Schenone told Sprague that he "got permission to whack Dominic, we got to figure out a way to do it. He said the only thing we can't do, we can't do it at his mother's house in the Bronx." Schenone sent Sprague to get his gun, but the gun was seized by the FBI and Tucci was not murdered.

The jury, believing the testimony that there was a chain of command in La Cosa Nostra and that the boss's approval was necessary for every murder, could infer that Ida had secured the boss's approval for Tucci's murder and so had entered into an agreement with Schenone to murder Tucci. That Ida later inquired of Schenone what he "was doing with the Dominic [Tucci] thing" could be interpreted as confirmatory of his participation. Regulating a conflict involving a Genovese Family associate and someone related to a Genovese Family soldier could be understood as Ida's purpose and qualify as a purpose to maintain his position in the racketeering enterprise.

A majority of the court believes that the foregoing constitutes sufficient evidence of Ida's conspiracy with Schenone to murder Tucci in furtherance of a racketeering enterprise. Judge Noonan is of the opinion that there was insufficient evidence to establish that Ida had the intent to kill Tucci and insufficient evidence of Ida's purpose to further the racketeering enterprise.

*Mail Fraud On The City of New York*

■ Ida was convicted of mail fraud on the City of New York, both in 1993 and 1994, in connection with mailings made to agents of the City to obtain permits for the

Feast of Saint Gennaro. The Feast of Saint Gennaro is annually celebrated for 10 days on Mulberry Street in New York City. The Society of Saint Gennaro of Naples and the Suburbs (the Society), a tax-exempt organization, filed applications with the appropriate city agencies to close the street and arranged to pay license fees to the City. The license fees were 20% of the value of the contracts made between the Society and the individual vendors operating during the Feast. The Society's vendor contracts provided that a typical vendor pay $1,200 for a stand. Members of Ida's crew collected the amount due the Society from the vendors in cash, taking in an amount typically as much as $3,800 for each stand. The $2,600 difference was not paid to the Society. The crew reported to Ida, who supervised the scheme both as its leader and as the consigliere of the Genovese Family.

On the Society's federal tax return as a tax-exempt organization, Louis Zacchia from Ida's crew was listed as "treasurer/director when necessary"; he was also identified as vice-president of the Society. His offices are sufficient to make the Society chargeable with his knowledge that cash revenue from the vendors was being diverted from the Society.

Further evidence was supplied by the testimony of D'Arco. He was asked whether he had learned that "organized crime controlled the Feast of San Gennaro." He replied that he had and that what he had learned was this: "They controlled the curb space and they ran the Feast. They had an association that was housed in a store, a store front, with the saint in it on Mulberry Street." He added: "The curb space along the whole length of Mulberry Street was rented. They rented it for stands and they collected money on that." D'Arco's testimony pointed directly to the Society of Saint Gennaro of Naples and the Suburbs as the association housed on Mulberry Street.

D'Arco then named individual members of the Genovese Family who had in turn "controlled" the Feast since the 1960s. He stated: "From 1988, when I became the captain, from that point forward, Jimmy Ida had control of that." When asked how he knew, he replied: "By talking with Jimmy and also with disputes that I had between Jimmy and Mickey Dimino [Michael Generoso] over our bread interests in the Feast."

A rational juror could infer from the financial importance of the vendors' cash payments to Ida's crew that Ida must have been aware of them and benefitted from them. A rational juror could infer that Ida must have known that the Society needed permits from the City to close the street and that the Society had to pay the City a fee based on the rents the Society collected. A rational juror could infer that Ida knew that the Society was not reporting the cash his crew took because these sums were not diminished by the City's 20% tax. The scheme to defraud was carried out by reports to the City omitting this cash. The intent to defraud, essential to proof of mail fraud and conspiracy to commit mail fraud, was Ida's intent to hide from the City the cash his crew and he got. The Society's mailings were a necessary feature of the scheme, so that the fraud, local in character, was accomplished by violation of federal law. *United States v. Bortnovsky,* 879 F.2d 30, 36–37 (2d Cir. 1989).

■ Ida was also convicted of conspiracy to defraud the United States by impeding the functions of the Internal Revenue Service in violation of 18 U.S.C. § 371. Such a conspiracy is conventionally labelled "a Klein conspiracy," referring to *United States v. Klein,* 247 F.2d 908 (2d Cir.1957), *cert. denied,* 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958). In *Klein,* eighteen acts were enumerated as acts of concealment of income establishing conspiracy to defraud the United States by impairing the functions of the IRS. *Id.* at 915. Ida's acts of concealment meet the standard set by *Klein.* In particular, he was convicted of causing the Society to file

false Tax Exempt Organization Returns. That he did the latter is established by his control of the collection from the vendors and his control of Zacchia, the Society's Treasurer.

Ida was doubly guilty because his own 1994 return did not reflect income from the Feast. Accepting the evidence that Ida's crew would have had to turn over to him part of the cash they took from vendors, a rational jury could conclude that omission of this amount from his return reflected a conspiracy between Ida and his crew to conceal this stream of cash from the IRS.

## Control Of Illegal Gambling

Ida was convicted of conducting two illegal bookmaking operations, one at the converted Tazza di Caffe at 171 Mulberry Street from January 1991 to January 1995, and the other at an apartment on 229 East 53rd Street from August 1994 to January 1995. The evidence consisted of recordings of bets made at 171 Mulberry Street and evidence of betting slips at 229 East 53rd Street. Ida does not challenge that five or more persons were employed at each establishment, as required to establish a violation of 18 U.S.C. § 1955. Ida does argue on appeal that there is insufficient evidence to show his connection with either operation. However, 171 Mulberry Street was run by Thomas Cestaro, a member of Ida's crew. In light of the government's expert's testimony regarding the duty of crew members to share proceeds from criminal activity with their capo, the jury could rationally conclude that crew members regularly shared what they took in with their capo, here Ida.

The evidence that Cestaro also ran the East 53rd Street apartment is circumstantial: Frank Santoro, an employee at this location, was arrested in a police raid and charged in state court with illegal gambling; he expected Cestaro to pay for his lawyer. It was rationally inferable that Santoro had the expectation because he was working for Cestaro. The connection with Cestaro is a connection to Ida, Cestaro's capo.

As a corollary of his control of illegal gambling, Ida was convicted of conspiracy to defraud the United States by hiding his income from the operations from the IRS. Conspiracy with Cestaro to conceal this income is proved by Ida's failure to report it on his 1994 and 1995 federal income tax returns and by Cestaro acting as the front man for the two gambling enterprises.

## Conspiracy To Control A Union Election By Violence

Local 46 of the Mason Tenders Union consists of general unskilled laborers employed at construction sites in Queens, including Kennedy Airport, a rich site for criminals bent on extortion. In 1989 the local was dominated by the Lucchese Family, which used it as a vehicle for extortion from construction contractors. At an earlier period it had been dominated by the Genovese Family. As a union election approached, the Lucchese Family candidate to be Local 46's president was Joe Luciano. The Genovese Family sought to regain control with their own candidate, Ed Diovisalvo. James Messera, a Genovese capo, informed the Lucchese Family that Luciano was a rat, i.e., a government informer. Ida, then a capo, repeated this accusation in negotiations with D'Arco for control of Local 46. At the end of the Ida–D'Arco discussions, the accusation was withdrawn, and Luciano was elected president of Local 46.

The negotiations between the two crime families made no pretense of democratic methods; the negotiators assumed that control could be passed from one criminal organization to the other. Ida and Messera were rationally found guilty of conspiracy to commit extortion because they sought to replace control of the union by the Lucchese Family with control by the Genovese Family—a control that necessarily rested not on democratic election but on at least the threat of violence in violation of 18 U.S.C. § 1951. The right of

the members of a union to democratic participation in a union election is property; that the right is intangible does not divest it of protection under the Hobbs Act. *United States v. Local 560 of the International Brotherhood of Teamsters,* 780 F.2d 267, 281 (3d Cir.1986).

Ida was also convicted of attempted extortion for the activities of Ed Diovisalvo during the period Ida was negotiating for control of Local 46. In this time Diovisalvo shook down several contractors dealing with Local 46. A rational jury could find that Diovisalvo reported to Messera who in turn reported to Ida.

*Extortion of P. Chimento Trucking Company*

■ Another dispute between the Genovese Family and the Lucchese Family involved P. Chimento Trucking. Evidence showed that in the 1980's up to late 1990 the company paid $8,000 to $10,000 a year to Pete DeFeo, a Genovese Family capo who did no work for the company. In 1989 the company contracted to do work for Emery Air Freight at Kennedy Airport. The Lucchese Family controlled unions in the air freight business and expected Chimento Trucking to sign contracts with these unions. Chimento Trucking refused. Ida, then a Genovese capo, intervened to explain to D'Arco that Chimento Trucking was "with us, ours," that is, that it was a tributary of the Genovese Family, with the implication that the Lucchese Family should not interfere with Chimento. As the dispute continued, Ida arranged for John Chimento to meet with Peter Chiodo, a capo in the Lucchese Family; Ida introduced Chiodo as his friend who would offer a new business opportunity for the company. Chiodo simply told Chimento that Chimento would have to use Chiodo's truck drivers at Kennedy. In January 1990 the Lucchese-dominated unions struck the warehouse at Kennedy used by Chimento Trucking. Ida worked to keep Chimento moving the freight. After four months of the strike, John Chimento paid the Lucchese Family $110,000,

and the strike stopped. Ida was convicted of conspiracy to commit extortion on behalf of the Lucchese Family.

On appeal, Ida argues that there was no evidence that he sought to extort money from Chimento Trucking for the benefit of the Lucchese Family. Rather, Ida appears as the company's friend during the strike and its defender against the threats from the Lucchese Family. The government responds with the comment of the district court on Ida's motion for acquittal: "The jury reasonably could have inferred that Ida agreed to the payment in order to gain something from the Lucchese Family in the negotiations or in exchange for a Lucchese promise to allow the Genovese Family to continue its control over Chimento." The district court further observed that the jury could reasonably infer that the Genovese Family used force or the threat of force to assure the annual payments to DeFeo, the Genovese capo, who did nothing to earn them. In other words, the jury could have believed that Ida's negotiations with D'Arco were part of a Genovese Family conspiracy to keep in place an annual extortion from Chimento Trucking. The evidence sustains Ida's conviction.

*Transportation Of Stolen Property In Interstate Commerce*

■ A further racketeering act with which Ida was charged was that from November 1, 1994 to April 1995 he and John Schenone and others transported in interstate commerce a stolen Caterpillar 950B Front End Loader worth over $5,000. In July 1995 Schenone was convicted of conspiracy to transport the Caterpillar loader in interstate commerce. Ida's conviction is supported by Schenone's obligation to share criminal proceeds with Ida as his crew leader. As the district court stated in response to Ida's motion for acquittal on the ground that he did not know of the projected interstate transport: "The fact that the goods in question were large, conspicuous machines, not readily concealed, supported the inference that the

stolen goods would have had to have been transported out of New York to avoid detection." The jury reasonably concluded that Ida shared this inference. His conviction is supported by the evidence.

As Ida does not contest the government's proof of any other elements of the RICO statute, the government has proved racketeering in violation of 18 U.S.C. § 1962(c) and (d) when it has proved two predicate acts of racketeering. Counts One and Two were accordingly proved. The substantive charges of mail fraud, illegal gambling, extortion, interstate transportation of stolen property, and fraud on the Internal Revenue Service were also established. In the view of the majority of the court the substantive charge of conspiracy to murder Tucci in furtherance of the racketeering enterprise was also established.

*Retroactive Misjoinder*

▉ Ida asks that the court retroactively find misjoinder if it finds that any of the predicate acts of racketeering were insufficiently proved. We hold that one such act was insufficiently proved:

*Conspiracy to Murder Ralph Desimone*

In 1991 D'Arco was acting boss of the Lucchese Family. Ida gave him a list of persons being proposed for membership in the Genovese Family. The acting underboss of the Lucchese Family, Anthony Baratta, said to D'Arco when he saw the name of Ralph Desimone, "He is a rat." A meeting was arranged in January or February 1991 with Ida, now the consigliere of the Genovese Family, and Michael Generoso, its acting underboss, and Liborio Bellomo, its acting boss. Baratta came, as did the acting consigliere of the Lucchese Family and D'Arco. Baratta told the group that Desimone had been a government witness. They asked if he was sure. Ida said, "Could you get us the minutes?" Baratta said, "Yes." At that point Generoso stepped forward and said, "We will take care of it." Along with his statement, Generoso made a motion with his finger

like a gun. Ida said, "Yeah." All of them nodded.

On June 13, 1991 Desimone's body was found in the trunk of his own car at LaGuardia airport, his legs bound and his head covered with plastic garbage bags. He had been shot twice in the head and three times in the chest. At trial the government offered evidence that the murderer had been a friend of Desimone's, Louis Ruggiero, and Ruggiero went on trial in this case for the actual murder as an act of racketeering violative of RICO.

The jury could reasonably have concluded from D'Arco's account of the conversation in which Baratta disclosed his information about Desimone that the leaders of the Genovese Family including Ida had agreed to procure his death. Ida now contends on this appeal that there is insufficient evidence to prove that there was an overt act on behalf of the conspirators to carry out their agreement. The circumstances under which Desimone's body was found suggested murder professionally executed. Money was in his wallet, suggesting that robbery was not the motive. The jury acquitted Ruggiero of the murder as an act of racketeering, a charge that required proof that the act was for money or intended to maintain or improve his position in the criminal enterprise. The absence of proof on the latter point did not mean that Ruggiero was innocent of the murder itself; as to that, the district court concluded, on the basis of the evidence presented, that Ruggiero was indeed the murderer. The Genovese Family had the motive to procure this murder.

Yet there is a gap in the government's case. The government contends in its brief that Ruggiero was "a long time Genovese associate." The evidence is that Ruggiero was known both to the murdered Family member Dilorenzo and to his own murder victim Desimone, a Family associate, and that Ruggiero was videotaped on three occasions in 1984 visiting the Palma Boys Social Club, a place where the affairs

of the Genovese Family were discussed. The evidence falls short of establishing that Ruggiero was a Genovese Family associate. It falls short also of showing that Ruggiero was the instrument of the Genovese Family in carrying out its conspiracy to kill Desimone. There is no proof of a connection between the murder and the putative murderer and the Genovese Family.

A rational jury could believe that a murder decided upon by the administration of the Genovese Family would be carried out. A reasonable jury could also infer that, when the person chosen to be murdered was in fact murdered, the murder was the overt act by which the conspiracy was carried out. The difficulty lies in a rational trier of fact being certain beyond a reasonable doubt of this inference. Desimone, an aspirant to membership in the Genovese Family and therefore a man of marked criminal proclivities, was put to death at least four months after the conspiratorial conclave. On the evidence presented there was no way that a reasonable jury could have been sure beyond a reasonable doubt that the murder was the overt act of the conspirators. Ida's conviction on this count, accordingly, cannot be sustained.

■ Nonetheless, we find no reason to order a new trial on the remaining counts of conviction. The charge of one conspiracy to commit murder was of a potentially inflammatory character, *see United States v. Wapnick*, 60 F.3d 948, 953–54 (2d Cir. 1995), *cert. denied*, 517 U.S. 1187, 116 S.Ct. 1672, 134 L.Ed.2d 776 (1996). But as the jury found Ida to be involved in two conspiracies to murder, it is speculative to suppose that three conspiracies to commit murder made him look worse than two. Moreover, the facts in each of the counts set aside are distinct and separable from the counts on which his conviction stands. No danger of overlap of the evidence existed. *See United States v. Rooney*, 37 F.3d 847, 856–57 (2d Cir.1994). No retroactive misjoinder is established.

We have considered the other objections made by Ida to his convictions and find them without merit. He does not challenge his sentence of life imprisonment.

## The Forfeiture of Ida's Property

■ Following Ida's conviction, a jury trial was conducted on the criminal forfeiture allegations in the indictment. The applicable forfeiture provision, 18 U.S.C. § 1963(e), does not specify the burden of proof to be applied by the jury. The court instructed the jury that the government must prove its case for forfeiture by a preponderance of the evidence. The jury returned a verdict of forfeiture. The district court entered an order of forfeiture of $1,000,000 worth of Ida's property.

■ On appeal, Ida asserts that the jury was erroneously instructed on the level of proof required, that the instruction should have required proof beyond a reasonable doubt. The Supreme Court, however, has determined that criminal forfeiture is part of the process of criminal sentencing. *Libretti v. United States*, 516 U.S. 29, 39–41, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995). Fact-finding at sentencing is made by a preponderance of the evidence. *United States v. Ruggiero*, 100 F.3d 284, 290–291 (2d Cir.1996). It follows as a matter of logic that, absent any indication to the contrary in the statutory text, criminal forfeiture pursuant to 18 U.S.C. § 1963(e) depends on the preponderance of the evidence. *United States v. Patel*, 131 F.3d 1195, 1200 (7th Cir.1997); *United States v. DeFries*, 129 F.3d 1293, 1312–13 (D.C.Cir.1997); *United States v. Rogers*, 102 F.3d 641, 647–48 (1st Cir.1996). No error occurred in the instruction.

### Nicholas Frustaci

Frustaci was convicted of two predicate acts of racketeering—conspiracy to commit extortion and operation of an illegal gambling business—together supporting violations of 18 U.S.C. § 1962(c) and of § 1962(d). He was also convicted of conspiracy to commit extortion in violation of

18 U.S.C. § 1951 and of conspiracy to defraud the Internal Revenue Service in violation of 18 U.S.C. § 371. He presses various objections against each of these convictions, which we review in turn. It is not challenged on this appeal that Frustaci was a member of the Genovese Family.

*Conspiracy To Commit Extortion*

■ In 1987 New York Tech Windows ("N.Y.Tech"), a window installation company, received referrals from, and shared some profits with, Summit Restoration ("Summit"). In 1988 N.Y. Tech terminated the arrangement. Later, Todd Mazlum and Anthony Barbarise, the company principals, were summoned to a meeting with Peter ("Petey") Chiodo, the Lucchese Family capo, who told them that "whatever Summit owned was his" and that N.Y. Tech's business was Summit's. Barbarise was smacked in the face to set the tone of this meeting. Mazlum and Barbarise were in fear.

N.Y. Tech through Todd Mazlum's cousin, Bobby ("Romano") Boyajian, got in touch with Frustaci, who undertook negotiations with Chiodo. Frustaci and Romano told Mazlum and Barbarise that Chiodo would allow N.Y. Tech to escape by a "buyout" or payment of $100,000. Mazlum asked Frustaci and Romano to negotiate a lower price, and eventually the payment was reduced to $25,000, which the company paid in cash to Romano. Frustaci later had a conversation with a witness cooperating with the government and was recorded recounting the incident and stating: "Petey said, 'Nicky, I'll give them to you because I love you like my brother.' . . . . N.Y. Tech is me now."

On these facts a rational jury could conclude that Frustaci had joined Chiodo in agreeing to extort N.Y. Tech and that, using the menace already conveyed by Chiodo, Frustaci conspired to force the cash payment of $25,000. That he could speak of the company as himself, using the same idiom Chiodo had earlier employed and that Ida used to explain his control of Chimento Trucking, highlights his view of the company as prey.

■ Frustaci objects to the closing argument of the prosecutor that touched on payments the company subsequently made on a car used by Frustaci without reference to the company's business. The prosecutor declared: "They're paying against their will." The prosecutor's inference was not an unreasonable one even if it undercut the statement of the government's own witness from the company. In any event it was harmless because the jury acquitted Frustaci on the substantive count of extortion of N.Y. Tech Windows; the jury, it must be inferred, looked only at the agreement Frustaci had with Chiodo.

■ The conspiracy was charged as an act of racketeering and as a separate crime. On appeal, Frustaci contends that the jury was improperly charged: "The defendant's racketeering activity either must be related to the enterprise's activities or the defendant must have been enabled to commit the racketeering activity solely by virtue of his position in the enterprise." Frustaci did not object to the instruction. Review here is for plain error. The objection focuses on a single sentence, ignoring the fact that the court went on to charge the jury: "This . . . element requires also that a defendant have had some role in the operation, direction, or management of the enterprise." This charge accurately complied with *Reves v. Ernst & Young*, 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Reading the instructions as a whole, the sentence just quoted does not conflict with the first quotation but complements it. There was no error. That Frustaci had a role in the operation of the Genovese Family so that he could bargain with Chiodo was established by the evidence.

■ Frustaci's contention that the district court improperly questioned Mazlum borders on the frivolous. Intelligent questioning by the trial judge is the

judge's prerogative; he need not be a silent spectator; Judge Kaplan's questions brought clarity to the examination of the witness.

Frustaci's conviction of conspiracy to extort as an act of racketeering was supported by the evidence.

*Illegal Gambling*

█ In March 1991 New York police executed a search warrant on a second-floor apartment at 517 Second Avenue in Manhattan. They found over 300 betting slips reflecting over $7,000 in bets for the day; four electronic gambling devices containing $870; and a satellite system enabling simultaneous reception from three racetracks. Frustaci was in the office. D'Arco testified that Frustaci had told him that he was the co-owner.

█ In the trial of the present case five New York state judgments of conviction of gambling charges of persons arrested in the March 1991 raid, including Frustaci, were admitted in evidence. Frustaci's counsel objected to the introduction of these judgments on the ground of relevance. The objection was properly overruled as the judgments went to two elements in the racketeering case: the enterprise involved five or more persons and was in violation of state law.

█ In closing argument Frustaci's counsel suggested that Frustaci could have had reasons for pleading guilty to the state gambling charge without being guilty in fact. The government objected to this argument as lacking a basis in the record, and the court sustained the objection. Frustaci's counsel then objected to admission of the state judgments, arguing that they were hearsay. This objection was forfeited. It was not made contemporaneously with the introduction of the evidence. *See United States v. Martinez,* 775 F.2d 31, 36 (2d Cir.1985).

█ To have his objection considered here, Frustaci must rely on the criteria permitting consideration of plain error.

*Olano,* 507 U.S. at 732. The introduction of the judgments was a conveniently expeditious way of proving what the government could have proved by more cumbersome routes, that at least five persons were involved in the operation of the gambling enterprise. The integrity of the trial was not violated by a shortcut unobjected to at the time it was taken. Because Frustaci fails to meet the plain error standard, we need not reach the issue of whether admission of the state judgments of conviction was error. *Id.*

Frustaci argues that he was prevented from putting forward as a defense the argument that sometimes people plead guilty for reasons other than actual guilt, for example to avoid an expensive trial or the risk of being convicted of a more serious charge. Frustaci offered no evidence that such was the case as to the gambling pleas. When he attempted to assert this theory in argument to the jury, the district court properly sustained the government's objection that the argument was without foundation.

Frustaci's conviction of illegal gambling as a second act of racketeering was supported by the evidence. As he was convicted of two predicate acts of racketeering, and has failed to raise challenges to the government's proof of the other RICO elements, he was properly convicted of violating 18 U.S.C. § 1962(c) and (d).

*Tax Fraud*

█ Like Ida, Frustaci was convicted of conspiracy to defraud the United States by impairing the functions of the Internal Revenue Service by concealing his income from his gambling enterprise, in violation of 18 U.S.C. § 371. His employees were shown to have shredded records of this unlawful business. He himself represented to the Veterans' Administration in applications made to it in 1991, 1992, 1993, and 1994 that he had no income. He himself did not file a federal income tax return.

Frustaci's offense went beyond his failure to file a return or to disclose his income. He took active steps to prevent discovery by the destruction of the gambling records and his misrepresentations to the VA. Frustaci argues that the only proof of gambling income was up to March 1991; he was indicted on June 10, 1996, so the five year statute of limitation, 18 U.S.C. § 3282, barred his indictment. The objection was not raised before this appeal and is forfeited. *United States v. Hansel,* 70 F.3d 6, 7 (2d Cir.1995). The objection is also without merit because the relevant statute of limitations is 26 U.S.C. § 6531(1) and (8). *United States v. Vogt,* 910 F.2d 1184, 1201 (4th Cir.1990), *cert. denied,* 498 U.S. 1083, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991). The overt acts of destroying records and the 1991 misrepresentation to the VA occurred within the six years allowed.

Frustaci does not challenge his sentence of five years' imprisonment to be followed by three years of supervised release.

The judgment against Ida is AFFIRMED in part and is REVERSED with respect to the conspiracy to murder Desimone; the judgment against Frustaci is AFFIRMED.