

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-29-2007

# USA v. McKee

Precedential or Non-Precedential: Precedential

Docket No. 05-3297

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation
"USA v. McKee" (2007). *2007 Decisions*. Paper 280.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/280

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 05-3297

UNITED STATES OF AMERICA

v.

KEVIN MCKEE,

Appellant

No: 05-3469

UNITED STATES OF AMERICA

v.

INGE DONATO,

Appellant

No: 05-3357

UNITED STATES OF AMERICA

v.

JOSEPH DONATO,

Appellant

_____


On Appeal from the United States District Court
for the District of New Jersey,
(D.C. Nos. 04-cr-00216-3, 04-cr-00216-2 & 04-cr-00216-1)
District Judge: Hon. Jerome B. Simandle

Argued: November 8, 2006

Before: SCIRICA, Chief Judge, McKEE and STAPLETON,
Circuit Judges

(Opinion filed: October 29, 2007)


Eileen J. O'Connor, Assistant Attorney General
John Hinton, III (Argued)
Alan Hechtkopf
Gregory Victor Davis

2

Brian D. Galle
Tax Division
Department of Justice
Post Office Box 502
Washington, D.C. 20044
Attorneys for Appellee, United States Department of Justice

Peter Goldberger (Argued)
Pamela A. Wilk
50 Rittenhouse Place
Ardmore, PA 19003-2276
Attorney for Appellants, Joseph Donato and Inge Donato

Rocco C. Cipparone, Jr., Esq. (Argued)
203-205 Black Horse Pike
Haddon, Heights, NJ 08035
Attorney for Appellant, Kevin McKee

George S. Leone, Esq.
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102
Attorney for Appellee, USA

---

OPINION

---

McKEE, Circuit Judge.

Defendants, Kevin McKee, Joseph Donato, and Inge Donato challenge their convictions for conspiracy to obstruct a government function, failure to pay federal employment taxes, and failure to file individual income tax returns for certain years. Each defendant makes specific claims regarding his/her conviction, and they collectively challenge the jury instruction on the conspiracy count, the sufficiency of the evidence, several evidentiary rulings, and the sentences that were imposed. Since we agree that the district court's jury instruction constructively amended the indictment, we will vacate the Defendants' convictions on the tax evasion charges in Counts 2 through 13 and remand for a new trial on those charges. In addition, we will reverse Inge Donato's conviction on Counts 14 and 16 because the evidence was insufficient to establish guilt beyond a reasonable doubt, and instruct the district court to enter a

4

judgment of acquittal on those counts on remand.[1]

## I. Background

During the period charged in the indictment, Joseph Donato and Kevin McKee owned and operated McKee-Donato Construction Company ("the Partnership"), a small New Jersey carpentry and home renovation business. Inge Donato functioned as the Partnership's bookkeeper. All three are longstanding members of the Reformed Israel of Yaweh ("RIY"), a small religious sect founded by Leo Volpe that opposes payment of taxes based upon the members' religious opposition to war and the taxes that fund it.

---

[1] Inasmuch as we are vacating each of the defendants' convictions on Counts 2 through 13, and Inge's convictions on two counts, we need not address the claims of error that pertain to sentencing. We will, however, address certain evidentiary rulings that are challenged in this appeal as the same issues may again arise if the Defendants are retried on the tax evasion charges.

The Partnership employed members of RIY as well as non-members. When providing the Partnership's payroll records to accountants for preparation of quarterly payroll tax returns (IRS Form 941), Inge Donato omitted payroll information for the employees who were members of RIY. Consequently, federal withholding taxes were not deducted from their paychecks. However, the correct payroll information was provided for employees who were not members of RIY, and their taxes were properly withheld from their paychecks. The omission resulted in incomplete and inaccurate quarterly tax returns for the Partnership for the applicable years. The Partnership also failed to withhold or pay employment taxes that should have been collected from RIY-member/employees for those same quarters. In addition, Kevin McKee and Joseph Donato failed to file their individual federal income tax returns for the years 1997 through 2000. As we shall explain, Joseph's

6

failure to file had consequences for Inge, who was also charged with failure to file for those years.

Kevin McKee and the Donatos were each charged separately with conspiracy to defraud the United States (Count 1), and employment tax evasion (Counts 2 through 13). In addition, they were each charged with failure to file their individual federal income tax returns for the years 1997 through 2000, in violation of 26 U.S.C. § 7203. (Counts 14 through 21).[2] The court granted Inge's motion for judgment of acquittal on Counts 15 and 17, charging her with failure to file for 1997 through 2000, because the evidence did not establish that she had income for those tax years. The court denied her motion for judgment of acquittal on Counts 14 and 16 based upon evidence that we will discuss detail below. The jury returned guilty

---

[2] The Donatos were charged in Counts 14 through 17 and McKee in Counts 18 through 21.

7

verdicts against all Defendants on each of the remaining counts, and this appeal followed their sentencing.

## II. Discussion.

### A. Constructive Amendment to the Jury Instructions

Defendants all contend that the jury instructions on Counts 2-13 were erroneous because they constructively amended the indictment. Defendants concede they did not raise this argument in the District Court, but claim they are nevertheless entitled to relief because the instructions constituted plain error. *See* Fed.R.Crim.P. 52(b). We agree. *United States v. Olano*, 507 U.S. 725 (1993).

An indictment is constructively amended when evidence, arguments, or the district court's jury instructions effectively "amend[s] the indictment by broadening the possible bases for conviction from that which appeared in the indictment." *United*

8

*States v. Lee*, 359 F.3d 194, 208 (3d Cir. 2004). We have held that a constructive amendment is an exceptional category of error because it violates a basic right of criminal defendants, the grand jury guarantee of the Fifth Amendment. *Id*. at 154 (3d Cir. 2002) (applying *United States v. Adams*, 252 F.3d 276 (3d Cir. 2001)). "A constructive amendment to the indictment constitutes 'a *per se* violation of the fifth amendment's grand jury clause.'" *Id*. at 148 (quoting *United States v. Castro*, 776 F.2d 1118, 1121-22 (3d Cir. 1985)). A constructive amendment of the charges against a defendant deprives the defendant of his/her "substantial right to be tried only on charges presented in an indictment returned by a grand jury." *United States v. Syme*, 276 F.3d 131, 149 (3d Cir. 2002) (citation omitted). Thus, where a trial court constructively amends a jury

9

instruction, our plain error analysis presumes prejudice. *Id.*[3]

Here, in instructing the jury about conduct that could establish the charged conspiracy, the court included failing to report information to the Partnership's accountant, and falsifying books and records. The court explained:

> Various schemes and devices may be used in an attempt to evade or defeat a tax. Affirmative attempts to evade federal employment taxes include, for example, filing

---

[3] Courts of Appeals are split on whether a constructive amendment to an indictment are *per se* reversible error under plain error review. Compare *United States v. Floresca*, 38 F.3d 706, 712-13 (4th Cir. 1994) (*en banc*) (holding that constructive amendments, which are *per se* reversible under harmless error analysis are also *per se* reversible under plain error analysis) with *United States v. Fletcher*, 121 F.3d 187, 192-93 (5th Cir. 1997) (refusing to reverse a constructive amendment absent an objection because "it could not have affected the outcome of the trial" and therefore there was no prejudice under a plain error analysis); *United States v. Remsza*, 77 F.3d 1039, 1044 (7th Cir. 1996) ("In the context of plain error review, the amendment must constitute a mistake so serious that but for it the defendant would probably have been acquitted in order for us to reverse.") (internal quotations omitted). In *United States v. Syme*, 276 F.3d 131, 154 (3d Cir. 2002), we held that although constructive amendments are not *per se* reversible, they give rise to a rebuttable presumption of prejudice.

10

false Employers Quarterly Federal Tax Returns (Forms 941), *falsifying books and records so as to conceal the payment of wages and the employment taxes due thereon, or failing to report to your accountant all of the wages paid to employees*.

Appendix ("App"). 984 (emphasis added).[4]

The superseding indictment charged each of the Defendants with attempted evasion of employment taxes by preparing, signing, and causing the filing of false and fraudulent federal employment tax returns. App. 73, in Counts 2 through 13.[5] Even though the government introduced evidence that books and records were falsified and information was withheld

---

[4] In adopting this instruction, the court apparently relied upon the points for charge that the government had tendered, and may not have realized that the italicized language included conduct that was supported by testimony, but not charged in the indictment.

[5] These taxes were not due from any individual, but from the employer, McKee-Donato Construction Company. Defendants were prosecuted as third parties, alleged to have attempted to evade (or to have aided and abetted the attempted evasion of) the taxes due from the Partnership as the "employer."

11

from the Partnership's accountant, that conduct was never charged in the indictment. Accordingly, the court's instructions had the effect of broadening the indictment to include conduct not charged in the indictment; conduct that government witnesses testified about during the course of the trial.

Defendants argue that the examples of tax evasion explained in the jury instruction but not charged in the indictment improperly broadened the indictment in violation of *Stirone v. United States*, 361 U.S. 212 (1960). There, the Court held that a defendant's Fifth Amendment right to due process includes the right to be tried only on charges returned by a grand jury, and that right is violated if the evidence and jury instructions broaden the possible grounds for conviction beyond that alleged in the indictment. *Id*. at 218-19.

The government concedes that the jury instructions did

12

not match the charges contained in the superseding indictment. However, the government reminds us that we must assess the jury instruction as a whole and rely upon the "almost invariable assumption of the law that juries follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 207 (1987). The government cites numerous cases from other jurisdictions to support its contention that "no constructive amendment arises from the admission of acts not charged in the indictment when the court's instructions to the jury preclude the possibility that the defendant was convicted on those acts." *See, e.g., United States v. Gonzalez*, 661 F.2d 488, 492 (5th Cir. 1981) (no constructive amendment in trial for conspiracy to distribute methaquaalone, despite admission into evidence of other types of illegal narcotics).[6]

---

[6] *See also United States v. Johnson*, 248 F.3d 655, 665 (7th Cir. 2001) (admission of evidence of pre-conspiratorial events did not

13

However, the problem here is that the jury instructions

---

broaden scope of conspiracy charged and therefore constructively amend the jury instruction); *United States v. Novak*, 217 F.3d 566, 575 n.22 (8th Cir. 2000) (no constructive amendment where court admitted evidence of wrongdoing prior to the time period alleged in the indictment); *United States v. Paredes-Rodriguez*, 160 F.3d 49, 55-56 (1st Cir. 1998) (no constructive amendment: "the setting forth, in approximate form, of [a] date in the indictment does not preclude the admission of evidence relating to events which occurred earlier."); *United States v. Frank*, 156 F.3d 332, 337-38 (2d Cir. 1998) (the overt act element of a conspiracy charge may be satisfied by admission of evidence of an overt act that is not specified in the indictment, so long as there is no prejudice to the defendant); *United States v. Lokey*, 945 F.2d 825, 831-32 (5th Cir. 1991) (proof of the conspiracy's existence before February 1987 was not a constructive amendment of the indictment); *United States v. Schnabel*, 939 F.2d 197, 203 (4th Cir. 1991) (no constructive amendment where jury instructions did not vary from the indictment); *United States v. Medina*, 761 F.2d 12, 16 (1st Cir. 1985) (the possibility that the jury might have convicted defendant of a different kidnapping than the one listed in the indictment was obviated by the district judge who charged the jury that evidence of a different kidnapping was not the crime with which defendant was charged "but would at most constitute evidence of similar overt acts as alleged in Count One of the indictment"); *United States v. Clark*, 732 F.2d 1536, 1540 (11th Cir. 1984) (no constructive amendment where defendants were charged with conspiracy to distribute one type of drug, but where a different drug was introduced at trial; the jury was clearly apprised that they had to find conspiracy to distribute the type of drug in the indictment to convict).

14

informed the jury that the Defendants could be convicted on the basis of conduct that was not charged in the indictment, of which they had no notice. The trial court gave a specific instruction on tax evasion that identified the conduct that could satisfy the affirmative act element of the charged conspiracy. As will be discussed in greater detail below, the government only had to prove one—not all—of the overt acts charged in the indictment. *United States v. Adamo*, 534 F.2d 31, 38 (3d Cir. 1976). Nevertheless, the Defendants can not be convicted on the basis of an overt act that is included in jury instructions, but not charged in the indictment. *Syme, supra*.

The language we have italicized in the above-quoted jury instruction, though only intended as examples of offending conduct, plainly referred to particular evidence in the case and therefore allowed the jury to convict the Defendants for

15

uncharged conduct. Accordingly, the court's instructions improperly amended the indictment. *See, e.g., United States v. Thomas*, 274 F.3d 655, 670 (2d Cir. 2001) (constructive amendment occurs when the terms of the indictment are effectively modified by the court's actions such that "there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment").[7] Unless the government can show with certainty

---

[7] Because the error affected the charging terms of the indictment, it is a constructive amendment, not a variance. *See United States v. Castro*, 776 F.2d 1118, 1121-22 & n. 1(3d Cir. 1985) (distinguishing constructive amendments from variances). "[A]mendments . . . occur when the charging terms of the indictment are altered . . . ." *Id.* at 1122. Variances occur when the charging terms are unchanged, "but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* If a variance between the indictment and the evidence "does not alter the elements of the offense charged, we will focus upon whether or not there has been prejudice to the defendant." *Id.*; *see also United States v. Syme*, 276 F.3d 131, 154 (3d Cir. 2002) ("The presumption of prejudice [of constructive amendments] under plain error analysis does not extend to the more frequently encountered category of variances from an indictment, which may be dismissed as harmless

16

that the jury did not convict Defendants based on those improper examples, we must find plain error and reverse Defendants' convictions on Count 1.

We realize that the court properly admonished the jury that Defendants were not on trial for any conduct not alleged in the indictment. The government relies upon that introductory instruction and the jury charge as a whole to argue that Defendants were not prejudiced by the constructive amendment because, as just noted, we presume that jurors follow the court's instructions on the law. *Syme,* 276 F.3d at 155. However, that legal axiom cuts both ways here. The government's argument ignores the fact that the court then gave examples of evidence that would establish the Defendants' guilt for the charged crimes, and included conduct the jury heard testimony about that

---

even when properly objected to at trial.").

17

was not charged in the indictment. If we presume, as we must, that the jury followed the court's instructions, we must conclude that there is a real possibility that the jury relied upon the uncharged examples of conduct to convict the Defendants, just as the court instructed.

The government insists, relying on *United States v. Boffa*, 688 F.2d 919 (3d Cir. 1982), *cert. denied*, 460 U.S. 1022 (1983), that we can conclude "with certainty" that the Defendants' conviction for tax evasion was based only on the affirmative acts of preparing, signing, and causing the filing of false federal employment tax returns, as alleged in the superseding indictment. In *Boffa*, the court held there was no prejudice where a curative instruction clarified that the jury could not convict the defendants of a RICO conspiracy unless it found that the conspiracy existed after a certain date. *Id*. The curative

18

instruction specifically pin-pointed the time period during which the conspiracy had to have been established. Here, however, there was no analogous instruction. The court did not tell the jury to rely only upon evidence of the specific overt acts charged in the indictment.[8]

In *Syme,* we recognized the difficulty of a defendant proving actual prejudice in this situation. 276 F.3d at 154. That difficulty caused us to reject the government's argument that the pattern of convictions demonstrated that the jury had not relied on the court's erroneous instructions. *Id.* at 155. As we have explained, it is nearly impossible for a defendant to demonstrate that his/her conviction was based on particular evidence or a particular theory. *Id*. Similarly, there is no way to determine

---

[8]In distinguishing between this case and *Boffa*, we do not intend to suggest anything about whether such a curative instruction would have negated the presumption of prejudice.

whether the jury convicted any or all of the Defendants here on the second and third examples in the instruction. *See id.* Accordingly, the presumption of prejudice arising from the constructive amendment has not been rebutted. *See id.* at 155. Leaving this error uncorrected would seriously affect the fairness and integrity of the proceeding. *Id.* at 155-56 (citing *United States v. Olano*, 507 U.S. 725, 736 (1993)). We must therefore vacate Defendants' convictions on Counts 2 through 13 of the superseding indictment and remand for further proceedings on those counts.

## B. Sufficiency of the Evidence

Although we are vacating the convictions on Counts 2 through 13, and remanding to the district court, the Defendants can only be retried on those counts if the Government introduced sufficient evidence to sustain those convictions;

20

otherwise, we must direct a judgment of acquittal on remand in order to avoid a violation of the Double Jeopardy clause. We must therefore determine if the evidence was sufficient to convict any of the Defendants on any of those counts. Accordingly, we will first address whether the evidence was sufficient to sustain the convictions on Counts 2 through 13, and then address the Defendants' remaining challenges to the sufficiency of the evidence.

We review the evidence in the light most favorable to the government. We do not reweigh the evidence or assess witness credibility. *See United States v. Peppers*, 302 F.3d 120, 126 (3d Cir. 2002). Viewed in that light, we must sustain the verdict "if a rational trier of fact could have found [the] defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence." *United States v. Coyle*, 63 F.3d 1239,

21

1243 (3d Cir. 1995). If there is substantial evidence to support the jury's determination, we will "not disturb the verdict although on that evidence we might not have made the same decision." *Cooper*, 121 F.3d at 133 (citing *United States v. Hannigan*, 27 F.3d 890, 892 (3d Cir. 1994)). Thus, our inquiry is limited to determining whether the jury's verdict is permissible. *See United States v. McGill*, 964 F.2d 222, 229 (3d Cir. 1992). We begin that inquiry with the Defendants' convictions for payroll tax evasion.

1. **Payroll Tax Evasion.**

Tax evasion requires the government to prove beyond a reasonable doubt: (1) an attempt to evade or defeat a tax; (2) an additional tax due and owing; and (3) willfulness. *See Sansone v. United States*, 380 U.S. 343, 351 (1965); *see* 26 U.S.C.A. § 7201. The "affirmative act" of evasion can be "any conduct, the

22

likely effect of which would be to mislead or to conceal." *Spies v. United States*, 317 U.S. 492, 499 (1943). Here, we believe that each element is established beyond a reasonable doubt as to all Defendants for each of the periods charged in Counts 2 through 13.

### a. Affirmative Act of Evasion

Defendants dispute the sufficiency of the evidence to convict them of tax evasion for the last three quarters of 2000 because the authenticity of the signatures on the corresponding 941 forms was not established. Defendants claim that the jury could not rely on 26 U.S.C. § 6064, which provides that the fact of a signature on the tax return is *prima facie* evidence that the return was signed by the named individual.

The government alleged that false Partnership employment tax returns for the quarters ending in March 1998

23

through January 2001 qualified as affirmative acts of evasion for Counts 2 through 13. *Sansone v. United States*, 380 U.S. 343, 352 (1965) (crime of tax evasion is complete as soon as the false understatement of taxes is filed); *see also United States v. Schafer*, 580 F.2d 774 (5th Cir. 1978), *cert. denied*, 439 U.S. 970; *Swallow v. United States*, 307 F.2d 81, 83 (10th Cir. 1962), *cert. denied*, 371 U.S. 950 (1963).

The Defendants are correct in noting that the signatures on the 941 forms were never authenticated. However, the fact that a return may have been signed by someone other than one of the Defendants does not necessarily undermine the jury's conclusion that Defendants knew the returns were false and approved the filings to evade applicable employment taxes. "The law does not require the defendant's own signature to sustain a conviction under § 7201: it merely requires sufficient

24

circumstances . . . from which a reasonable jury could find that the defendant did authorize the filing of the return with his name subscribed to it." *United States v. Fawaz*, 881 F.2d 259, 265 (6th Cir. 1989). The jury could therefore reasonably have concluded that either Joseph or Inge Donato signed the 941 Forms and that each Defendant authorized the fraudulent filings.

Inge Donato was McKee-Donato's bookkeeper and there was no evidence to suggest that her duties changed during 2000—the disputed time period. The jury could therefore conclude that Defendants continued to execute the payroll for the Partnership in the same manner they had during the previous eleven years: Inge generated and managed the company payroll records upon which the false tax returns were based, and each payday Joseph Donato and/or Kevin McKee handed out "untaxed" paychecks to their RIY-member/employees and "taxed" paychecks to their other employees. Given our

25

obligation to draw all reasonable inferences in favor of the verdict winner, *Jackson v. Virginia*, 443 U.S. 307 (1979), we can not conclude that the evidence on Counts 2 through 13 was insufficient.

Moreover, the overt acts of Joseph and Inge on behalf of the Partnership may be imputed to Kevin McKee for the period 1997 through 2000. During that period, McKee shared the obligation of filing employment taxes on behalf of the Partnership. An employer has a duty to deduct from its employees' gross wages, scheduled amounts for their social security contributions, and to pay income tax, 26 U.S.C.A. §§ 3102(a), 3402(a); and to hold them in trust for the United States until remitted. *Id.* § 7501(a). The tax laws provide for criminal liability for any person who "willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment

26

thereof . . . ." 26 U.S.C.A. § 7201. Section 7343 of the U.S. Code explains that the term "person," as used in the chapter of the Internal Revenue Code concerning criminal liability for tax evasion, "includes . . . a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 7343. Defendants all satisfy the code's definition of a "person" for purposes of criminal tax liability. Inge and Joseph were actively involved in the process of filing the tax returns. As partners, Kevin McKee and Joseph Donato each had a legal duty to file accurate tax returns on behalf of the Partnership. Accordingly, the fraudulent filings satisfied the overt act of tax evasion for all three Defendants.

Defendants also argue that the government failed to establish that they intended to conceal or mislead. They contend

27

that without that *mens rea*, the government's proof fails. *See* Donato's Br. at 29. Defendants are correct that the mere failure to *file* a tax return cannot, by itself, support a finding that he/she affirmatively attempted to evade the payment of taxes. A person cannot be convicted of tax evasion based merely on an omission; "the person must also undertake an affirmative act of evasion." *United States v. Romano*, 938 F.2d 1569, 1573 (2d Cir. 1991); *see also McGill*, 964 F.2d at 231 (mere failure to *pay* assessed taxes, without more, does not constitute evasion of payment, though it may satisfy requirements for willful failure to pay taxes).

Here, however, we have more than a mere "omission." Defendants filed tax returns that falsely stated the total amount of employee wages owed to the United States by deliberately omitting RIY-member/employee wages. Their

28

misrepresentation of the total wages subject to employment taxes was a willful act of concealment. Thus, they did not merely fail to file, or fail to pay, like the defendants in *Romano* and *McGill* respectively. Rather, they filed returns that misled by affirmative misstatement, thus concealing crucial tax information. *See McGill*, 964 F.2d at 231 ("[A]ffirmatively evasive acts-acts intending to conceal-are punishable under § 7201."). In rejecting a challenge to the sufficiency of the evidence, we have instructed that *Spies* and its progeny:

> simply require that there be some evidence from which a jury could infer intent to mislead or conceal . . . . [I]t is for the jury to determine, as a matter of fact, whether the affirmative act was undertaken, in part, to conceal funds from or mislead the government.

*United States v. Voigt*, 89 F.3d 1050, 1090 (3d Cir. 1996).[9]

---

[9] As we have repeatedly stated, circumstantial evidence is routinely offered to satisfy the intent element in criminal cases. *See generally United States v. Iafelice*, 978 F.2d 92, 98 (3d Cir. 1992) ("It

Defendants' misstatements of the total employee wages subject to federal taxation satisfy this requirement, notwithstanding their public and vocal opposition to taxes. *See Swallow v. United States*, 307 F.2d 81, 83 (10th Cir. 1962) ("A wilful intent to evade or defeat tax liability may be inferred from the conduct of the taxpayer.") (footnotes omitted).

Defendants also claim that their failure to file accurate returns was equally consistent with innocent activity. Donatos'

---

is not unusual that the government will not have direct evidence. [*Mens rea*] is often proven by circumstances."). This rule applies equally to tax evasion prosecutions. *United States v. Voigt, 89 F.3d 1050, 1090 (3d Cir. 1996)*. The Supreme Court has stated that "any conduct, the likely effect of which would be to mislead or conceal," is sufficient to satisfy the "affirmative act" element. *Spies v. United States*, 317 U.S. 492, 499 (1943); *accord United States v. Conley*, 826 F.2d 551, 556 (7th Cir. 1987) (rational jury can infer intent to evade upon learning of manner in which defendant conducted his financial affairs). This requires that there be "some evidence from which a jury could infer an intent to mislead or conceal beyond mere failure to pay assessed taxes; it is for the jury to determine, as a matter of fact, whether the affirmative act was undertaken, in part, to conceal funds from or mislead the government." *Voigt*, 89 F.3d at 1090.

Br. at 28 (citing *United States v. Matsinger*, 191 F.2d 1014, 1016 (3d Cir. 1951) ("[A] case may not be submitted to a jury when the actions of the accused are as consistent with innocence as with guilt . . . .")). However, the evidence we have already discussed was sufficient to allow the jury to conclude that the false filing was intentional, *see, e.g.,* 26 U.S.C.A. § 3102(a) (employer's duty to deduct from its employees' gross wages scheduled amounts for their obligations to make social security and other tax contributions), even if Defendants' also had an "innocent" motive. *See United States v. Jungles*, 903 F.2d 468, 473-74 (7th Cir. 1990) (activity that is itself lawful can constitute an affirmative act to evade); *see also United States v. Pollen*, 978 F.2d 78, 86 (3d Cir. 1992) (transporting funds to foreign countries, thereby making it more difficult to trace, provides inference of intent to evade), *cert. denied*, 508 U.S. 906 (1993).

31

Therefore, even if Defendants' failure to accurately report the total wages subject to employment taxes was motivated by their desire to respect their employees' religious convictions, that "innocent" motive does not exempt Defendants from their obligation to deduct federal taxes and accurately report the wages subject to that tax, particularly since the cornerstone of the tax system is voluntary self-reporting. *Thomas v. United States*, 41 F.3d 1109, 1113 (7th Cir. 1994) (The tax code "requires employers to withhold federal Social Security and income taxes from the wages of their employees and to hold those taxes in trust for the government. 26 U.S.C. §§ 3102 , 3402. Employers must report and pay the taxes they withhold quarterly."). Given the evidence here, failure to comply with these requirements by concealing wages subject to withholding is sufficient to support a finding that Defendants intended to evade the Partnership's employment tax obligation.

### b.     Tax Due and Owing

The existence of a tax deficiency is an essential element of the crime of tax evasion. However, the government need not allege or prove the precise amount of additional tax due and owing. *See United States v. Citron*, 783 F.2d 307, 314-15 (2d Cir. 1986). The evidence need only establish a substantial tax deficiency. *See United States v. Johnson*, 319 U.S. 503, 517-18 (1943); *United States v. Burdick*, 221 F.2d 932, 934 (3d Cir. 1955). The government established this element with the uncontested testimony of an IRS agent regarding the deficiency charged in Counts 2 through 13.

### c.     Willfulness

As we have already explained, the element of willfulness protects the average citizen from criminal prosecution for innocent mistakes in filing tax forms that may result from

nothing more than negligence or the complexity of the tax laws. Willfulness requires the voluntary, intentional violation of a known legal duty as a condition precedent to criminal liability. *Cheek v. United States*, 498 U.S. 192 (1991) (citations omitted); *see also United States v. Pomponio*, 429 U.S. 10, 12 (1976). Defendants argue that their opposition to payment of federal taxes was openly expressed, Donatos' Br. at 27, and, therefore, the government failed to prove intent or wilfulness. They characterize the proof at trial as "consistent with [defendants'] having only intended to respect the religious convictions and wishes of [RIY] employees." *Id.* at 29.

We reject that argument based upon the totality of the evidence we have already discussed. *See United States v. Habig*, 390 U.S. 222, 222-23 (1968) (citing *Swallow*, 307 F.2d at 83 ("The offense is complete when the taxpayer files a false

34

and fraudulent return with intent to evade or defeat any part of the tax due. A wilful intent to evade or defeat tax liability may be inferred from the conduct of the taxpayer.") (footnotes omitted)).

The Defendants were selective in not reporting wages. The jury could certainly conclude that this was not merely negligence or an unfortunate coincidence, but could only have been willful and deliberate. That conduct was inherently likely to mislead or conceal. See *Spies*, 317 U.S. at 499 (affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries of alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of

35

which would be to mislead or to conceal). "[W]e have often held that repetitious conduct resulting in underpayment of taxes may be sufficient to show willfulness." *Ashfield*, 735 F.2d at 105 (consistent failure to include all income on the books and records of a defendant's business); *see also United States v. Alker*, 260 F.2d 135, 148 (3d Cir. 1958) ("consistent understatement [of tax liability] is evidence of willfulness"); *United States v. Frank*, 245 F.2d 284, 287-88 (3d Cir. 1957) (proof of a consistent pattern of underreporting "is itself enough" to sustain a jury finding of willful tax evasion). *See also United States v. Greenlee*, 517 F.2d 899, 903 (3d Cir. 1975) ("a two year pattern of derelictions . . . [is] itself indicative of the willfulness"). That is precisely what the government established here.

Moreover, since Defendants were aware of Leo Volpe's

36

criminal conviction, they knew that their religiously based opposition to taxes did not excuse compliance with the revenue laws or immunize them from the consequences of their willful conduct. The Defendants argue that the government's consistent failure to prosecute them even though they were outspoken in their opposition to paying taxes, caused the Defendants to believe that the IRS had excused them from paying federal taxes. The jury obviously rejected this interpretation of the evidence, and so do we. On the contrary, willfulness may be proven through the evidence of Defendants' tax protestor activities. *See United States v. Hogan*, 861 F.2d 312, 316 (1st Cir. 1988) (jury was properly allowed to consider animosity toward the IRS as an indication of defendant's willfulness); *United States v. Grosshans*, 821 F.2d 1247, 1252 (6th Cir. 1987) (defendant's attendance at tax protestor organizational meetings admissible to show willfulness); *United States v. Turano*, 802

37

F.2d 10, 11-12 (1st Cir. 1986) (defendant's statements and actions at tax protestor meetings useful to establish state of mind); *United States v. Reed*, 670 F.2d 622, 623 (5th Cir. 1982) (defendant's philosophy, motivation, and activities as tax protestor admissible to show intent).

Defendants maintain that Volpe's conviction for criminal tax evasion was inadmissible because he was convicted for failure to *pay* taxes, while Defendants were charged with failure to *file* taxes. Defendants thus claim that the evidence was irrelevant and prejudicial and should have been excluded. The distinction Defendants make, though technically correct, is not sufficient to alter our analysis of the evidence here because Volpe's conviction put Defendants on notice that failure to comply with tax laws can have criminal consequences even if motivated by religion.

McKee argues that the government did not establish that he knew that the Partnership was selectively withholding employee payroll taxes or that he agreed to it since he did not sign the fraudulent tax forms and was not involved with the financial aspects of the Partnership. *See Benatar v. United States*, 209 F.2d 734 (9th Cir. 1954) (finding that defendant president's signature on tax forms was sufficient evidence to support conviction for conspiracy with corporation to defraud Government by obstructing proper functions of IRS); *United States v. Sun Myung Moon*, 718 F.2d 1210 (2d Cir. 1983) (upholding conviction of conspiracy to file false tax returns and/or obstruct justice based on evidence that executive defendant closely scrutinized his personal affairs and was aware of information contained in his tax returns); *United States v. Cyprian*, 23 F.3d 1189, 1202 (7th Cir. 1994) (finding that evidence supported conviction for conspiracy to defraud

39

government where defendant personally paid employees in cash, and was responsible for filing tax forms on behalf of employees and providing them with W-2 forms).

McKee is correct that unlike the proof in *Benatar*, *Sun Myung Moon* and *Cyprian*, the government did not present evidence that he signed tax forms, closely scrutinized the payroll records that Inge maintained, regularly paid employees, or was responsible for filing tax forms on behalf of employees or providing them with W-2 forms. However, as we have already stressed, "rank and file" employees were aware of what was happening with withholding on wages of RIY members and non-members. It was therefore reasonable for the jury to infer that McKee, a named partner involved with the operation of the business, also knew. The evidence established that employees who worked for the company knew generally that "any [RIY]

40

member who worked for McKee-Donato did not pay federal income tax . . . that was a help to both parties to not - - it was a relationship to get out of paying those taxes."  App. at 658-59; *see also* App. at 296-97 (non-RIY-member/employee testifying that RIY member/employees were paid by a different payroll company and were not subject to withholding).  Moreover, the cases McKee relies upon did not involve individuals with a long history of protesting taxes and instructing others on how to avoid audit trails to minimize chances of detection.

On this record, the jury could conclude that McKee had to have known that the federal payroll forms omitted RIY-member/employees' information; yet, he took no steps to correct the situation or report the unreported wages.  That is sufficient to establish willfulness.

**2.	Conspiracy To Defraud the Government (Count 1).**

41

In order to prove a conspiracy to defraud the United States in violation of 18 U.S.C. 371 (Count 1), the evidence must establish the following elements beyond a reasonable doubt: (1) an agreement to defraud the United States, (2) the defendant's knowing and voluntary participation in the conspiracy, and (3) each conspirator's commission of at least one overt act in furtherance of the conspiracy. *See United States v. Rankin*, 870 F.2d 109, 113 (3d Cir. 1989).[10] "To conspire to defraud the United States means primarily to cheat the government out of property or money, but also means to interfere with or obstruct the government by deceit, craft, trickery, or at least by means that are dishonest." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).

---

[10] The conspiracy that was charged in Count 1 is known as "a *Klein* conspiracy," referring to *United States v. Klein*, 247 F.2d 908 (2d Cir. 1957), *cert. denied*, 355 U.S. 924 (1958).

We address the sufficiency of the proof of each of these elements in turn.

### a. Agreement

Defendants make much of the fact that the government failed to introduce any direct evidence of an agreement; however, direct evidence is not required. Rather, a conspiratorial agreement can be proven circumstantially based upon reasonable inferences drawn from actions and statements of the conspirators or from the circumstances surrounding the scheme. *See, e.g.*, *United States v. Smith*, 294 F.3d 473, 478 (3d Cir. 2002) (A reasonable juror could certainly conclude that a tacit agreement exists amongst a group of people when they engage in "so many unusual acts."); *see also United States v. Barr*, 963 F.2d 641, 650 (3d Cir. 1992) ("It is well settled that a written or spoken agreement among alleged co-conspirators is

43

unnecessary; rather, indirect evidence of [a] mere tacit understanding will suffice."). Thus, a conspiratorial agreement does not have to be explicit. *See United States v. Perez*, 280 F.3d 318, 353 (3d Cir. 2002) (In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake . . . the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others."). Indeed, common sense suggests, and experience confirms, that illegal agreements are rarely, if ever, reduced to writing or verbalized with the precision that is characteristic of a written contract. Rather, the illegal agreement can be, and almost always is, an implicit agreement among the parties to the conspiracy. *See, e.g., United States v. Price*, 13 F.3d 711, 728 (3d Cir. 1994) (many of the understandings in drug distribution conspiracies are implicit).

44

Here, proof of an agreement included undisputed evidence of RIY's anti-tax teachings, Defendants' commitment to those teachings, their positions within RIY, and their steady ascent up the tiers of influence within the organization. However, Defendants can not be convicted solely because of their associations. *See Barnes Found. v. Township of Lower Merion*, 242 F.3d 151, 163 (3d Cir. 2001) (citing *N.A.A.C.P. v. Claiborne Hardware*, 458 U.S. 886, 918-19) (1982) (additional citation omitted)). First Amendment protections require that the government produce more than evidence of association to impose liability for conspiracy. The Supreme Court has instructed that, "[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Claiborne Hardware*, 458 U.S. at 920. Moreover, evidence of intent must be judged

45

"according to the strictest law." *Id.* at 919.

We believe that the evidence here satisfies this "strictissimi juris" doctrine. The government produced evidence of RIY's advocacy of non-tax-payment as well as overt acts and omissions on the part of the Partnership to effectuate those goals. For example, the Partnership failed to file 941 payroll tax reporting forms for employees who were members of RIY so that they did not have to pay federal taxes; yet, that information was provided for employees who were not members of RIY. Accordingly, the taxes of those nonmembers were withheld as required by law. The jury could infer an agreement to run the Partnership in a manner that was consistent with RIY's teachings based on the roles Kevin McKee and Joseph Donato had in the Partnership. Both men were perceived as the "boss," exercising positions of supervisory authority at McKee-Donato

46

Construction. App. 292, 313, 318-19. Although Joseph Donato was usually the one who handed employees their paychecks, the evidence established that both men did so. Moreover, depending on who was primarily responsible for a given job, both McKee and Donato exercised final decision-making powers. App. 319. Although Kevin McKee and Joseph Donato never executed a written partnership agreement, the evidence established that both regularly received Partnership distributions over the years, and it was undisputed that both had an ownership interest in the Partnership. App. 854.

McKee contends that he had no knowledge of any illegal agreement and he could therefore not be convicted of conspiracy. Although a defendant's failure to report income can be an overt act in furtherance of a *Klein* conspiracy, the government must "still prove there was an agreement whose

47

purpose was to impede the IRS (the conspiracy), and that each defendant knowingly participated in that conspiracy." *United States v. Adkinson*, 158 F.3d 1147, 1154 (11th Cir. 1998). Of course, as we have just explained, where there is no direct evidence "of an agreement by all for each to evade his income taxes," the government can rely on circumstantial evidence. *Id*. Nevertheless, "[t]he failure to disclose income is, without more, generally insufficient . . . .", *id*., to support a conviction for a *Klein* conspiracy. "To be sufficient, the evidence must establish an agreement among the conspirators with the intent to obstruct the government's knowledge and collection of the revenue due." *Id*. "When the government relies upon circumstantial evidence to establish a tax conspiracy, the circumstances must be such as to warrant a jury's finding that the alleged conspirators had some common design with unity of purpose to impede the IRS." *Id*.

48

McKee also argues that there was insufficient evidence to convict him because the evidence did not establish that he was involved with bookkeeping or general management. He stresses that the evidence demonstrated that his partnership role at McKee-Donato did not generally include business decisions or filing the Partnership's tax returns. For instance, the representative for the firm that processed weekly payroll for the Partnership testified that he dealt with Joseph Donato and every 941 payroll tax reporting form in evidence was purportedly signed by either Joseph or Inge Donato, not McKee. Likewise, no evidence was presented that McKee submitted (or even saw) any payroll tax forms. The accountant for McKee-Donato testified that during the eleven years that she did payroll tax returns for the firm, she had never once spoken to McKee and that she always received the company's ledger from Inge Donato.

49

Nonetheless, inasmuch as we must interpret the evidence in the light most favorable to the government and determine if the evidence, so viewed, could establish guilt beyond a reasonable doubt, *United States v. Gambone*, 314 F.3d 163 (3d Cir. 2005), we believe the government's proof of McKee's participation in the conspiracy and its failure to file 941s for the Partnership was sufficient to establish his agreement.

It was widely known to McKee-Donato employees that the paychecks of RIY-member/employees at McKee-Donato did not have federal withholding taken out even though those taxes were withheld from the paychecks of employees who were not members of RIY. *See* App. 658-59, 290, 296-97. Moreover, for a period of time, a separate payroll company was used for employees who were not RIY members, *see* App. 296, and there was a noticeable difference in the checks of members and

50

nonmembers. App. 300 (Michael Chambers, a Partnership employee testified: "The paychecks were different, the members' paychecks were from the local bank, and all the checks we received [*sic*] from the window envelope, mailing envelope."). One non-member/employee testified: "[I]t was pretty noticeable that our checks were different. They came in different envelopes each week." App. 296 (Chambers).[11] The jury could certainly conclude that McKee knew at least as much as his employees about the difference between the checks of members and nonmembers. This is particularly true since McKee occasionally handed out the paychecks, *see* App. at 327, the company was very small and had only two partners, McKee

---

[11] According to one witness, the non-RIY employees' paychecks had a window envelope and were paid through Ajex Enterprises, an outside bookkeeping company, whose name appeared at the top of the check. App. 300, 430. The RIY-employees' checks were different. *Id.* at 299-300. They were paid by McKee-Donato bookkeeping and appeared to come from the local bank. *Id.*

and the Donatos had a close relationship through the Partnership as well as through RIY, and all three openly subscribed to the anti-tax principles of RIY. App. 290 (Chambers testified: "They [Joe and Kevin] didn't believe in federal income taxes is the statement Joe made . . . . Joe indicated that it was a war tax, and they didn't believe in war.").[12]  In addition, McKee's personal belief that paying federal taxes was wrong was expressed openly to Partnership employees.  App. 320-21 (Michael Gruszkoski, a Partnership employee testified: "Joe and Kevin both mentioned they don't think paying federal taxes is right, that the military spending on it was wrong.").

The jury could conclude, based on the foregoing evidence, that McKee intended that the business in which he was a partner be run in a manner that was consistent with his

---

[12] This statement was not admitted for its truth, but rather as proof that Kevin McKee was open about his stated beliefs.

personal beliefs about the evils of paying taxes, and that he entered an agreement to that effect. App. at 321. Additional evidence proffered by the government further supports the jury's conclusion. This includes evidence that all three Defendants were involved in leadership positions with RIY—a group that counseled its members on how to conceal audit-trails in order to avoid detection by the IRS, and the fact that McKee did not file his personal federal income taxes. Given our deferential standard of review, this evidence was clearly sufficient to convince a reasonable fact finder beyond a reasonable doubt that Kevin McKee had agreed with the Donatos to engage in practices that interfered with the government's ability to collect taxes from the members of RIY who were employed by the Partnership, and that all three were criminally culpable for the Partnership's failure to file 941 forms as charged in Counts 2

through 13.[13]

**b.    Participation**.

To prove Defendants' participation in the conspiracy, the government also had to establish "a 'unity of purpose,' intent to achieve a common goal, . . ." *United States v. Wexler*, 838 F.2d 88, 90-91 (3d Cir. 1988); *see also United States v. American Investors of Pittsburgh, Inc.*, 879 F.2d 1087, 1100 (3d Cir.), *cert. denied*, 493 U.S. 955 (1989). The government must proffer evidence that he/she knew of the agreement and intended both to join it and to accomplish its illegal objects. *See United States v. Rankin*, 870 F.2d 109, 113 (3d Cir. 1989).

Our discussion of the evidence of an agreement is equally

---

[13] The evidence of Joseph and Inge's agreement is even more substantial than McKee's. Everything we have discussed regarding McKee applies with greater force to Joseph Donato who was more directly involved in the business of the Partnership and an equally active member of RIY. Inge functioned as the bookkeeper.

applicable here. The knowing and intentional participation of Defendants in the charged conspiracy is a fair inference from the evidence of their positions in RIY and their involvement in the Partnership. A defendant's knowledge and intent may be inferred from conduct that furthered the purpose of the conspiracy. *See Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943). Inge's deliberate embrace of the conspiracy and its illegal objectives is clear from her role in the preparation of the federal payroll tax returns that falsely omitted the names and wages of the RIY employees and from her signature on RIY employees' paychecks that McKee and Donato distributed. Joseph's deliberate participation was established by his role as supervisor of McKee-Donato employees, his activities managing the business, and ultimately by evidence of his signature on the payroll records and tax returns.

55

Kevin McKee's participation was less direct. To support its argument that his conviction should be sustained, the government relies on case law holding that membership in a conspiracy may be satisfied with evidence of only a slight connection to the scheme. *See United States v. McGlory*, 968 F.2d 309, 321 (3d Cir. 1992). However, "those having no knowledge of the conspiracy are not conspirators." *United States v. Falcone*, 311 U.S. 205, 210 (1940). "At a minimum, . . . it must be shown that . . . a person has knowledge of the conspiracy's illicit purpose when he performs acts which further that illicit purpose." *United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975). Nevertheless, it goes without saying that, notwithstanding the quantum of evidence needed to connect a defendant to a given scheme, guilt must still be established beyond a reasonable doubt. To establish McKee's participation, we must determine whether there was sufficient evidence for the

56

jury to find that McKee was aware of the nature of the conspiracy and that he was committed to it. *See United States v. DiPasquale,* 740 F.2d 1282, 1292 (3d Cir. 1984).

McKee was a name partner in a business entity that was obligated to file withholding forms and pay withholding taxes to the government. Although the relevant tasks were principally carried out by Inge Donato, the evidence we have already discussed, including the size of the partnership, the general knowledge of employees that the checks of RIY members were different from those of nonmembers,  and the relationship between the three Defendants, supports an inference that McKee knew and consented to the manner in which Inge carried out those tasks, and that he participated in the scheme. McKee was not an absentee partner who knew nothing of the Partnership's activities. He was responsible for resolving problems that arose

57

on a given project (App. 319); supervising RIY-member/employees, assisting with hiring and firing (App. 292), and periodically distributing paychecks to RIY-employees that always omitted withholding. (App. 327) Although a conspirator's stake in the venture is not an essential element of the crime of conspiracy, the existence of such a stake is relevant to the question of deliberate participation. *See Direct Sales Co.*, 319 U.S. 703, 713. Here, the Defendants' stake in the venture satisfied both a financial and a philosophical motive; it allowed Joseph Donato and Kevin McKee to have an income without compromising their opposition to the tax system because they could undermine the government's ability to collect the taxes they opposed. App. 658-59.

In addition, as we previously stressed, the government introduced evidence that the fraudulent withholding was

58

common knowledge amongst the Partnership's employees. A reasonable juror could certainly conclude that a name partner with day-to-day involvement in McKee-Donato also knew of the fraudulent activity, and participated in it as a partner. This is particularly true since that activity benefitted McKee by furthering his personal belief system, while allowing him to offer employment to RIY-members that did not compromise his opposition to the "war tax."

In *United States v. Bellomo*, 176 F.3d 580, 591-592 (2d Cir. 1999), the defendant's conviction was upheld for his participation in a *Klein* conspiracy consisting of acts of concealing income. The evidence established that the defendant controlled an organization that filed false tax returns, and that he supervised members of his "crew" who collected money that was never reported to the IRS, including the organization's

treasurer. The court concluded that a rational juror could infer from the importance of the cash payments to defendant's crew that the defendant must have been aware of them and benefitted from them. *Id*. at 591.

We realize, of course, that the Partnership's business is a far cry from the illegal enterprise in *Bellomo*. There are limits inherent in any analogy that attempts to compare a legitimate home repair and carpentry company to a "business" operation run by organized crime that is concerned only with profit and the coercion and intimidation necessary to ensure it. The evidence here was that the Partnership's business was conducted professionally. Thus, any attempt to compare the Partnership with the enterprise in *Bellomo*, is limited at best. Moreover, unlike the defendant in *Bellomo*, McKee did not independently control the organization that filed false tax exempt returns;

60

McKee's business management responsibilities at the Partnership were significantly less than those of Joseph Donato. Nonetheless, McKee's activities at the Partnership, combined with all of the other evidence in the case is sufficient to allow a jury to conclude that McKee was also aware that fraudulent tax returns were being filed by the Partnership, and that he participated in the scheme.

Defendants correctly remind us that association alone will not support a conviction for conspiracy. *United States v. Cole*, 704 F.2d 554, 557 (11th Cir. 1983). However, there is much more here than mere association. Moreover, the jury did not have to ignore the anti-tax beliefs of RIY members, or the association between the Donatos and McKee, either within RIY or in the Partnership itself.

Based on the evidence we have already discussed, the

61

participation element is also satisfied for both Joseph and Inge

Donato. *See Sleight v. United States*, 82 F.2d 459 (D.C. Cir.

1936) (a partner is liable for the criminal acts of a co-partner if

he possesses guilty *knowledge* of the criminal act of his

co-partner or is an accessory thereto either before or after the

fact) (emphasis added); *see also United States v. Ward*, 168 F.2d

226, 229 (3d Cir. 1948) (same).

### c.      Overt Act

Proof of a *Klein* conspiracy also requires proof of at least

one overt act in furtherance of the charged conspiracy.  An overt

act is any act performed by any conspirator for the purpose of

accomplishing the objectives of the conspiracy. *See United*

*States v. Falcone*, 311 U.S. 205, 207 (1940) ("[T]he gist of the

offense of conspiracy . . . is agreement among the conspirators

to commit an offense attended by an act of one or more of the

conspirators to effect the object of the conspiracy").   The

government's evidence of an overt act focused on Inge Donato's role in the preparation and filing of the payroll taxes.

"The Supreme Court [has] held that the criminal act of one conspirator in furtherance of the conspiracy is attributable to the other conspirators for the purpose of holding them responsible for the substantive offense." *United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001) (citing *Pinkerton v. United States*, 328 U.S. 640, 647 (1946)). (quotations and original brackets omitted); *see also United States v. Guadalupe*, 979 F.2d 790, 793 (10th Cir. 1992) (Under 18 U.S.C. § 371, a conviction for conspiracy requires that the government prove beyond a reasonable doubt that the defendants agreed to defraud the United States and that one of the conspirators committed an overt act in furtherance of the conspiracy.). However, an overt act of one conspirator is the act of all, even absent proof of any

63

agreement directed to that act. *United States v. Walls*, 225 F.3d 858, 864 (7th Cir. 2000). Viewed against the backdrop of RIY's tax animus, the Partnership's failure to report income of its RIY member employees established the overt act of concealment. *See Bellomo*, 176 F.3d at 591-92.

Accordingly, we reject Defendants' challenge to the sufficiency of the evidence to prove the conspiracy charged in Count One.[14]

---

[14] Defendants were not charged with conspiring to commit a substantive offense, but more generally with conspiring to defraud the United States. See *United States v. Vasquez*, 319 F.2d 381, 384 (3d Cir. 1963). Willfulness is not an element of the crime of conspiring to defraud the United States. *See United States v. Shoup*, 608 F.2d 950, 956 (3d Cir. 1979). Nevertheless, the Donatos also argue that, based on our decision in *United States v. Alston*, 77 F.3d 713, 718-21 (3d Cir. 1996), the government was required to prove, in addition to the statutory elements discussed in the conspiracy section *supra*, that Defendants acted willfully with respect to the charged conspiracy. We need not determine whether that case added an additional element to the crime of conspiracy to defraud the United States because there is clearly sufficient evidence of the Defendants' willfulness with regard to the substantive charges.

### 3. Failure to File Individual Tax Returns

#### a) Inge Donato

Inge Donato challenges the sufficiency of the evidence to convict her for willful failure to file tax returns in 1997 and 1999, Counts 14 and 16. The district court granted Inge's motion to dismiss Counts 15 and 17 because the government did not establish that she had income for those tax years. However, the court denied her motion on Counts 14 and 16 based on evidence of income in the form of proceeds of three Partnership checks that purchased two cars titled in her name, and a paint job on her home where she lived with Joseph. To sustain the conviction, the evidence must be sufficient to prove each of the following elements beyond a reasonable doubt: (1) she was required to file the tax returns; (2) she failed to file them; and (3) her failure was willful. *See United States v. Foster*, 789 F.2d

457, 460 (7th Cir. 1986). As we will explain, we agree that the government's evidence was not sufficient to establish her guilt on Counts 14 and 16 beyond a reasonable doubt, and we will direct the district court to enter a judgment of acquittal on those counts.

A married individual's tax responsibilities are separate from those of her spouse with respect to her own income unless she elects to file jointly. *See* 26 U.S.C.A. 1(a) (Married individuals filing joint returns); 26 U.S.C.A. 6013 (Joint returns of income tax by husband and wife). Accordingly, the district court instructed the jury as follows:

> [i]f the married couple files no returns, the law presumes that the tax status of the husband and wife is married filing separately. Therefore, if you find that no tax return has been filed by a married person, you will assume that his or her taxpayer status would be married filing separately.

66

App. at 993. The court then informed the jury of the gross annual income needed to trigger the legal requirement to file tax returns in 1997 and 1999 for a taxpayer whose filing status was married, filing separately. In 1997 that amount was $2,650 and in 1999 it was $2,750.

The government conceded it lacked evidence that Inge Donato was compensated for the services that she performed for the Partnership with a regular paycheck, and that she was not paid a salary. However, the government attempted to impute the purchase of household items with McKee-Donato checks to her as income. The government established that Partnership checks totaling $29,887.80 were used to purchase a Honda Accord and to pay for a paint job on the Donato's residence in December 1997. The car was titled in Inge's name. App. 852, 854. The government thus claimed that Inge's tax obligation in 1997 was

67

half the value of the Accord and the cost of painting the Donato residence, or $14,943.90.

For the tax year 1999, the government presented evidence that Inge earned half of the value of an Acura automobile that was purchased with a Partnership check ($5,100). That car was also titled in her name. The government's theory was that the proceeds from the Partnership checks in 1997 and 1999 constituted income to her because it represented compensation for work Inge did for the Partnership. However, the government did not establish that the proceeds were *intended* as compensation for work Inge did for the Partnership or that if it was, Inge knew that it was so intended and that she therefore had a duty to file returns for those years.

At the outset, we note that the government's theory of "compensation" is technical in the extreme in that it attempts to

68

hold Inge criminally liable for knowledge of the definition of "taxable income" that would more appropriately be expected of a tax attorney or accountant, rather than a spouse who helped out at her husband's business over the years. Although the government argues that the paint job and the cars were compensation in lieu of a salary, it only charged her with one half the value of the two cars and half the value of the paint job. There is no attempt to explain why the checks could not just as likely have been intended as support, or interpreted as such. Moreover, if the payment was intended as compensation for her work at the Partnership, there is nothing to explain why only half of the total amount of the three checks constituted compensation although the cars were solely in her name, and no explanation is apparent to us.

Inge disputes that the cars and the paint job were income

under the tax laws.  She argues that they were just as likely to have been support or gifts from her husband, the breadwinner, and that they therefore did not constitute income.  *See* 26 U.S.C.A. §§ 61, 102(a), 2501(a) ("Gross income" for tax purposes does not include gifts, which are taxable to donor, rather than to recipient); *see also* Bors I. Bittker & Martin McMahon, Jr., *Federal Income Taxation of Individuals*, ¶ 5.02 ("Amounts paid by breadwinners to support their spouses and minor children are routinely excluded from the beneficiary's gross income even though they satisfy a legal obligation.") (2007).

Inge only had a duty to file if the money that was used to pay for the cars and the paint job was income to her, and not a gift or support.  *See, e.g.*, 26 U.S.C. § 2502(c) (When a gift is made, the gift tax liability falls on the donor).  Even assuming

70

that the proceeds of the Partnership checks constituted income, she can not be criminally liable for failing to pay taxes on that income unless she knew that she had a duty to pay the resulting taxes and "voluntarily and intentionally violated that duty." *Cheek*, 498 U.S. 192. The government must prove that an individual has a duty to file a tax return based on the receipt of taxable income. *Clawson v. United States*, 198 F.2d 792, 794 (9th Cir. 1952). However, "[o]nly true income can be considered in determining whether [a defendant] was obliged to file an individual tax return, and . . . the prosecution has the burden of establishing any money received as being true income." *Id.*

The government cites *United States v. Fogg*, 652 F.2d 551, 553-55 (5th Cir. 1981); and *United States v. Lacob*, 416 F.2d 756, 760 (7th Cir. 1969), to support its argument that it

71

established a *prima facie* case by proving that Inge received unreported funds that had the appearance of income. However, neither case supports that contention. Both cases involved individuals who received funds in *consideration* of a business arrangement or for legal work and then failed to report it. Moreover, the nature of the consideration in those cases was sufficient to itself put the recipient on notice that he was receiving compensation. In *Fogg,* the defendant received "kickbacks" from an orange juice supplier. *Id.* at 553-54. The defendant did not report these "kickbacks" as personal or corporate income. *Id.* at 54. The court explained the situation as follows:

> This appeal concerns the amazing attempt of appellant, the corporate president of a thriving food store chain, to skim approximately $80,000 per year off the wholesale price that his company paid for orange juice and pour it, tax-free, into his own pocket.

72

*Id*. at 553. That is not this case, and *Lacob* does not advance the government's position any farther.

In *Lacob*, the defendant was an attorney specializing in personal injury litigation who received funds in the form of settlement checks, but did not deposit the entirety of the checks received; giving the appearance of having received less and thereby underreporting income to the IRS. 416 F.2d at 760.

The government provides no authority to support its claim that a married spouse's purchase of shared household items with a check from the working spouse's business puts the receiving spouse on notice that some portion of the proceeds constitute income with a concomitant tax obligation.[15] The

---

[15] Given the frequency with which spouses voluntarily help out by doing work for the family business owned by the other spouse, the general proposition the government is relying upon could have sweeping consequences that would impose criminal tax liability for all manner of gifts and support.

73

distributions the government relies on here could just as reasonably be viewed as support or a gift from Joseph Donato to Inge. Indeed, the fact that the government attributes only half of the value of the cars and the paint job to Inge is consistent with that view. Without evidence tying these checks to compensation for work Inge did for the business her husband partially owned, those checks could just as well have been contributions to the marital household or support. This is particularly true of the funds used to paint the Donatos' home, and no attempt was made to separate those proceeds from proceeds to purchase the two cars that were titled solely in Inge's name.

There is no evidence here that would allow a jury to reasonably relate the amount of any of the checks to the amount of time Inge "worked" at the Partnership, or to conclude that the

74

checks were intended to compensate her for work she had historically done on an unpaid basis. For example, the government did not show that her hours in 1997 and 1999 were so markedly different than her hours in other years that she would have known that the checks were intended as compensation for work she had historically done without pay. Similarly, there is no evidence that Inge did substantially more work in 1997 than in 1999 and therefore no attempt to explain the disparity in the amounts of the Partnership checks used to purchase the Honda and the paint job one year ($14,943.90), and the Acura two years later ($5,100).

The only direct evidence the government provided to prove these items were intended as compensation for work done at the Partnership consisted of the "expert" testimony of an IRS agent. He gave his legal opinion that the purchase of the Honda

75

and Acura and paint job constituted income chargeable to Inge. However, that expert opinion does not appear to be based on anything more than the checks and Inge's work at the Partnership; work she had historically done without compensation. Moreover, even if we accept that unsupported opinion, Inge is no tax expert and clearly can not be charged with the tax knowledge of a purported IRS tax expert. Furthermore, although the government claims that these items constituted a personal benefit to Inge, demonstrating a personal benefit is not enough. Support and gifts also benefit the recipient. Indeed, it is hard to imagine giving a gift that the grantor does not intend to benefit the recipient. The same is true of support; it certainly benefits the recipient who may be dependent upon it. Thus, benefit alone can not establish income.

A transfer of property is income if it is the result of "the

constraining force of any moral or legal duty, constitutes a reward for services rendered, or proceeds from the incentive of anticipated benefit of an economic nature." *United States v. Harris*, 942 F.2d 1125, 1128 (7th Cir. 1991) (quoting *Commissioner v. Duberstein*, 363 U.S. 278, 285 (1960)). "Under *Commission v. Duberstein*, the donor's intent is the critical consideration in distinguishing between gifts and income." *Harris*, 942 F.2d at 1127 (citations and quotation marks omitted). The evidence here does not establish beyond a reasonable doubt that Joseph intended to compensate Inge for her help by giving her money to paint the home they lived in, rather than simply conveying a gift. "A transfer of property is a gift if the transferor acted out of a detached and disinterested generosity, . . . out of affection, respect, admiration, charity, or like impulses." *Id.* at 1128 (citation and quotation marks omitted).

*Harris* is instructive. There, the jury convicted two women for tax evasion based on a substantial sum of money each was paid by a very wealthy widower who enjoyed the company of younger women. On appeal, the convictions were reversed because the evidence failed to show the money was intended as income as opposed to a gift, and because the government did not establish the recipients knew the money was intended as income. In reversing, the court of appeals explained, "[t]his failure to show [the donor's] intent is fatal to the government's case." *Id.* at 1129.

The same fatal flaw undermines the government's proof here. Moreover, even if Joseph intended the checks as compensation, there is nothing to show that Inge knew of any such intent on Joseph's part for the Partnership checks she received in 1997 and 1999. Accordingly, her convictions on

78

Counts 15 and 17 can not stand, and we will remand with instructions to vacate the convictions on those counts, and enter a judgment of acquittal.[16]

### b)      Joseph Donato

Joseph Donato also argues that the government did not prove his failure to file an individual federal tax return was willful.

As is evident from the preceding discussion of Inge's conviction, and as the Court of Appeals for the Sixth Circuit has explained:

> The word "willfully," as used in this statute, means a voluntary, intentional violation of a known legal duty. In other words, the defendant must have acted voluntarily and intentionally and with the specific intent to do something he knew

---

[16] Because we reverse Inge Donato's conviction on those Counts, we need not address her challenge to the pertinent jury instructions.

> the law prohibited, that is to say, with intent either to disobey or to disregard the law. Negligent conduct is not sufficient to constitute willfulness.

*United States v. Tarwater*, 308 F.3d 494, 510 (6th Cir. 2002).

This element is satisfied here by evidence of Joseph's failure to file, together with his participation in routine strategy sessions with RIY members regarding how to avoid the creation of audit trails, his failure to file federal payroll taxes for the employees of McKee-Donato, evidence of his tax protest activities, and his knowledge of the conviction and sentencing of Leo Volpe for failure to pay federal income tax.[17]

---

[17] We recognize that this same evidence applies with equal force to Inge; however, as we have explained, the evidence did not establish that she had a duty to file, and proof of her willfulness is therefore not enough to support a conviction. On the other hand, Joseph Donato knew that he had income from his Partnership; the business was his livelihood, and there is no issue about his knowledge of his duty to file.

We of course appreciate the fact that the jury quite naturally may have believed that Inge would not have paid taxes on any of the income she received from the Partnership even if Joseph intended to compensate her and even if she knew of that intent. However, that is not dispositive. Absent that intent on the part of Joseph, and absent

80

Although a reasonable jury could not conclude that Inge Donato was guilty of a failure to file her individual tax returns on the strength of the evidence presented, *see United States v. Cooper*, 121 F.3d 130, 133 (3d Cir. 1997), Joseph Donato's conviction is supported by the evidence. Accordingly, we will affirm Joseph Donato's conviction for failure to file his individual federal tax returns.

## C. Evidentiary Challenges

Kevin McKee challenges several evidentiary rulings, and Inge and Joseph Donato adopt some of those challenges. Although we have already granted all of the Defendants a new trial on Counts 2 through 13, we still must consider the evidentiary challenges relevant to those Counts in order to provide guidance should the government choose to retry

Inge's knowledge of such an intent, she simply can not be held criminally liable for not filing returns as we have explained.

81

Defendants, and also to determine if a new trial should be granted on any of the remaining counts. We hold that a new trial is necessary only for Counts 2 through 13 based upon the constructive amendment to the jury instruction that we discussed at the outset.[18]

McKee challenges the evidence concerning the arrest and prosecution of Leo Volpe. He argues that this evidence was irrelevant and unduly prejudicial because "[a] defendant ha[s] a right to have his guilt or innocence determined by the evidence presented against him, and not by what happened with regard to a criminal prosecution against someone else." *United States v. Toner*, 173 F.2d 140, 142 (3d Cir. 1949). Although we certainly

---

[18] Our discussion of the evidentiary challenges pertaining to Counts 2 through 13 necessarily overlaps our discussion of the sufficiency of the evidence because much of the same evidence is relevant to other counts in the indictment and that evidence had to be considered as part of our analysis of the sufficiency of the evidence to convict on other counts.

agree that none of the Defendants could be convicted based on his association with Leo Volpe, that does not mean this argument has merit. As the government points out, a jury may properly take into account the defendant's awareness of relevant circumstances, including relevant court decisions that undermine a defendant's good faith defense with regard to interpretation of the Internal Revenue Code. *See Cheek*, 498 U.S. at 202.

When willfulness is an element of a charged tax offense, courts routinely allow the government to introduce evidence that, prior to the conduct in question, a defendant became aware of the tax improprieties inherent in that conduct. *See, e.g., United States v. Dack*, 987 F.2d 1282, 1285 (7th Cir. 1993). Volpe's prosecution and conviction for failure to pay taxes based on religious practices embraced by the Defendants, together with McKee's knowledge of those facts, were thus

83

properly admitted for the purpose of disproving his good faith defense even though Volpe's charges were not identical to the charges here. We also agree with the government that whether the jury was correctly advised that Volpe was convicted of willful failure to pay a tax or willful failure to file is irrelevant. The applicable statute, 26 U.S.C. § 7203, governs persons who both fail to file and fail to pay taxes and the willfulness element applies equally to both.

We likewise find that the admission of evidence regarding McKee's marriage to Volpe's widow was properly admitted. We review the district court's ruling for plain error where, as here, there was no objection. App. 716 (objection made and withdrawn). After Volpe died, Volpe's widow assumed a leadership role within RIY. McKee assisted her in the leadership of RIY, and they subsequently married. As we

84

have explained, evidence of a tax protestor's activities and philosophies is admissible to prove willfulness. *See, e.g., Grosshans*, 821 F.2d at 1252. McKee's relationship with the leader of an organization that promoted tax-protestor philosophies, and his leadership role, is relevant to his willfulness. Moreover, even if the evidence of McKee's marriage to Volpe's widow was improperly admitted, any error would have been harmless in light of the overwhelming evidence of McKee's tax animus.

Defendants all object to the admission of statements by Inge to a radio talk-show host, and statements by Joseph Donato to law enforcement agents. We also review those rulings for plain error and find none. Apart from Inge's admission that she does not pay taxes, Inge's statements were offered to show that RIY members openly protested taxes. That suggests an anti-tax

85

philosophy which was relevant to proving Inge Donato's willfulness. We note yet again that evidence of willfulness may be found in a defendant's tax protest activities and philosophies. *See Hogan*, 861 F.2d at 316 (defendant's attitude toward Internal Revenue Service was relevant as indication of willfulness of his attempted tax evasion); *Grosshans,* 821 F.2d at 1252. Moreover, the limiting instructions were sufficient to ensure that the jury considered the statements each defendant made only with regard to his or her own guilt where appropriate.

McKee and Donato offer an alternative basis for the judge's alleged error in admitting Inge's statements over the radio. They maintain that the admission constituted plain error under the Confrontation Clause of the Sixth Amendment and violated the rule of *Bruton v. United States*, 391 U.S. 123 (1968). McKee and Inge make the same claims with regard to Joseph Donato's statements to the IRS. A *Bruton* analysis is

triggered where an admission of a co-defendant is so "powerfully incriminating" or "devastating" that a limiting instruction fails to adequately safeguard the defendant's Sixth Amendment rights. 391 U.S. at 135-36. Although Inge's statement was not a full confession, it provided evidence that supported a key element of the government's case: willfulness. However, we do not agree that the circumstances here implicate *Bruton*. The statements in question added little, if anything, to the totality of the evidence against each defendant, the court gave appropriate cautionary instructions, and the circumstances are not such as to negate the effectiveness of those instructions. Thus, the court's rulings on these statements readily survive plain error review. *See Olano*, 507 U.S. at 732.

Moreover, even if the district court erred in admitting the radio broadcast evidence, it was harmless. Aside from Inge's

87

broadcast, there was substantial evidence to establish that Inge, McKee, and Joseph Donato had expressed their committed opposition to paying the "war tax." App. 321, 336-37, 531-33, 624-25, 650-52. Furthermore, Defendants' conceded their beliefs about the immorality of the federal tax system and their self-exemption from the revenue laws. *See Virgin Islands v. Joseph*, 964 F.2d 1380-90 (3d Cir. 1992) (holding that admission of evidence in violation of Confrontation Clause was harmless because it did not relate to the contested issue before jury).

Likewise, there was no plain error in permitting the IRS agent to testify about Joseph Donato's admissions. These included RIY's open condemnation of the "war tax," the non-filing history of RIY's members, and McKee's status as Donato's business partner. App. 292, 354, 618-25, 648-49, 658-

59, 161-64. Defendants' tax protestor philosophies and non-filing histories were not contested, nor was Donato's status as McKee's partner.[19]

## D.    Prosecutorial Misconduct

Finally, Defendants argue that the government committed reversible misconduct during closing argument by questioning the sincerity of their religious beliefs. Defendants contend that misconduct occurred when the prosecution asked the jury why the Defendants would not pay state taxes if their religious beliefs were genuinely based on the "war" tax. The prosecutor thus suggested that the only reason Defendants failed to file

---

[19] Defendants further allege that the admission of Inge's radio interview and Joseph Donato's statements to the IRS also violated their Fifth Amendment right to a fair trial. This adds nothing to their *Bruton* claims. *See Bruton*, 391 U.S. at 135-36 (analyzing the fair trial consequences of Confrontation Clause violations). Moreover, we reject the Defendants' Fifth Amendment claim for the same reasons we reject their Sixth Amendment claim.

state taxes was to hide their tax protestor activities, and to "stay under the radar." App. 1007. He also questioned how Defendants' beliefs explained their evasion of Social Security and Medicare taxes. We do not believe that the prosecution's remarks "resulted in an egregious error or a manifest miscarriage of justice." *United States v. Irizarry*, 341 F.3d 273, 306 (3d Cir. 2003).

Although these remarks may be viewed as excessive or overly zealous, they can also be viewed as a proper comment on the evidence. Throughout the trial, Defendants introduced evidence of their good-faith belief as well as the absence of IRS action despite their open tax protest, to prove their lack of criminal intent. These themes were advanced by Defendants in their opening statements, their cross-examination of witnesses, and in direct evidence of character and opinion evidence of

90

honesty, truthfulness and sincerity.[20]  *See, e.g.,* App. 306 (defense cross-exam of witness Chambers regarding Joseph Donato's genuinely held belief against paying federal taxes because he considered it a war tax), 336-37 (defense cross-exam of witness Gruszkowski regarding Donato's belief that the federal tax supported war or killing), 638-39, 688, 495 (defense cross-exam of witness Noto regarding defendants' reputation for honesty and trustworthiness), 503 (same, witness Gibson).  *But compare* App. 1026-27 (defense closing arguing that Donato's religious belief against paying the war tax is not his defense), 1032-33 (defense closing argument that individual defendants were under no obligation to deduct taxes, only the construction

---

[20] Defendants concede that appellant McKee's opening theme did advance the theme of religious sincerity, but argue that an opening is not evidence and the government's remedy, if McKee went too far, was not to retaliate in closing, but to object and ask the court to enforce its pretrial rulings.  Donatos' Reply Br. at 13, n.6.

company itself).

The prosecution was thus entitled to challenge Defendants' implicit good-faith defense, and to preemptively address any sympathy arising from the Defendants' religious views.

**CONCLUSION**

For the foregoing reasons Defendants' convictions on Count 1 for conspiracy to defraud the United States are affirmed. However, based on our constructive amendment analysis, we will vacate Defendants' convictions on Counts 2 through 13 of the superseding indictment and remand for a new trial on those counts. Inge Donato's convictions on Counts 14 and 16 will also be reversed and vacated, and the district court will be ordered to enter a judgment of acquittal on both of those counts on remand.

92